Will Parks CLAY, Appellant,

v.

UNITED STATES of America, Appellee.

No. 15996.

United States Court of Appeals Fifth Circuit.

Dec. 11, 1956.

Paul M. Conaway, Thomas A. Jacobs, T. Reese Watkins, Macon, Ga., for appellant.

Floyd M. Buford, Asst. U. S. Atty., Macon, Ga., Frank O. Evans, U. S. Atty., Robert B. Thompson, Asst. U. S. Atty., Macon, Ga., for appellee.

Before HUTCHESON, Chief Judge, and BORAH and BROWN, Circuit Judges.

John R. BROWN, Circuit Judge.

The question is not whether conviction of a person whose prior criminal record, reputation and papers in his possession at the time of seizure, support the view that he may be a gambler engaged in the numbers racket, outweighs the risk to freedom if the search and seizure of these papers is sustained. If the search and seizure was unreasonable, then, according to constitutional standards, the fundamental law established to protect the good and the bad, the wicked and the righteous, from the historical hazards to genuine liberty, compels corrective judicial action if properly invoked.

Clay is no stranger[1] to us, or to the law, or to excesses in the process of

---

1. Conviction for the alleged offense of July 8–9, 1953, involved in this case only indirectly as a claimed basis for the officers' belief (see note 7, infra) that Clay

search and seizure in law enforcement. Concerning the papers seized January 28, 1954, he sought, by motion, to suppress their use in future prosecution which, save for a Complaint filed before the Commissioner, Fed.Rules Crim.Proc., rule 3, 18 U.S.C.A., has not been instituted by Information or Indictment, Fed. R.Crim.P. 7.

■ Whether the supposed crime was of misdemeanor or felony grade, cf. Mosely v. United States, 5 Cir., 207 F.2d 908, certiorari denied 347 U.S. 933, 74 S.Ct. 626, 98 L.Ed. 1084; Contreras v. United States, 5 Cir., 213 F.2d 96; Clay v. United States, 5 Cir., 218 F.2d 483; Reynolds v. United States, 5 Cir., 225 F.2d 123, certiorari denied 350 U.S. 914, 76 S.Ct. 197, 100 L.Ed. 801, it was one involving merely the failure to pay an occupation and excise tax [2] as a gambler and the possible carrying on of that business *before* registering and paying the stamp tax. United States v. Kahriger, 345 U.S. 22, 73 S.Ct. 510, 97 L.Ed. 754; Lewis v. United States, 348 U.S. 419, 75 S.Ct. 415, 99 L.Ed. 475. The significant thing is that the taking, placing or handling of wagers or conducting a lottery is not a Federal crime unless registration and payment of taxes is not made. Transportation,[3] as such, is not

---

was engaged in the lottery business, was reversed by us, Clay v. United States, 5 Cir., 218 F.2d 483, (January 1955) long after the events of January 28, 1954, involved herein. However, submitted simultaneously below were motions to suppress the fruits of the January 28, 1954 seizure, as well as the earlier search and seizure of July 8, 1953, which the District Court held to have been unreasonable, following which the Information for the July 8 offense was dismissed.

2. Chapter 27a—Wagering Taxes, § 471 (a), Act October 20, 1951, 26 U.S.C.A. §§ 3285 through 3298 (now recodified 26 U.S.C.A. §§ 4401 through 4423). Under § 3285 an excise tax of 10% is imposed on all wagers, which expressly includes lotteries. Section 3290 requires the payment of an annual $50.00 occupation tax for a person "who is liable for [the] tax * * * or who is engaged in receiving wagers for or on behalf of any person so liable." Section 3291 requires registration. Section 3292 expressly incorporates, amongst others, Section 3271 that "No person shall be engaged in or carry on any trade or business mentioned in this chapter until he has paid a special tax therefor in the manner provided in this chapter." Section 3294 covers penalties establishing a fine of $1,000.-00 to $5,000.00 for persons liable for the tax who do not pay it and subsection (c), for willful violations, expressly incorporates 26 U.S.C.A. § 2707 (Firearms Tax Statute) with the following gradation of penalties:

2707(a) "Any person who willfully fails to pay, collect, or truthfully account for and pay over the tax imposed by section 2700(a), or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty of the amount of the tax evaded, or not paid, collected, or accounted for and paid over, to be assessed and collected in the same manner as taxes are assessed and collected. No penalty shall be assessed under this subsection for any offense for which a penalty may be assessed under authority of section 3612."

2707(b) "Any person required under this subchapter to pay any tax, or required by law or regulations made under authority thereof to make a return, keep any records, or supply any information, for the purposes of the computation, assessment, or collection of any tax imposed by this subchapter who willfully fails to pay such tax, make such returns, keep such records, or supply such information, at the time or times required by law or regulations, shall, in addition to other penalties provided by law, be guilty of a misdemeanor and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than one year, or both, together with the costs of prosecution."

2707(c) "Any person required under this subchapter to collect, account for and pay over any tax imposed by this subchapter, who willfully fails to collect or truthfully account for and pay over such tax, and any person who willfully attempts in any manner to evade or defeat any tax imposed by this subchapter or the payment thereof, shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than five years, or both, together with the costs of prosecution."

3. Of course, carrying or transporting "in *interstate* or *foreign* commerce any pa-

a crime. All of this is important since the mere act of a known gambler driving an automobile on a public highway will not justify an officer forcing him to stop to be searched or arrested for a suspected violation of the Federal Wagering Tax Act.

And yet that is all that occurred on January 28. Revenue Agents in two passenger cars, one privately owned, one Government owned but with no identification of its official status discernible to passing or overtaken vehicles, took up a concealed vigil on the Macon-Columbus highway about a mile east of Hester's store-residence in anticipation that, following his frequent pattern, Clay would go there for a brief stay about 2:00 o'clock in the afternoon. Clay passed this point in his Buick, driving in a normal manner at moderate speed. The two cars fell in behind him, but on attempting to overtake and stop him, Clay, saying that he was apprehensive of highway robbery, shot up his speed to 60 to 70 m. p. h., allowed his car to slip partially over in the left-hand lane across the center stripe to force the Agents'

cars back, but almost immediately returned to his own lane. The Government car came abreast of Clay and the Agent pounding on the right-hand front door of the Government car (with a pistol, Clay said; by bare hand according to the Agent) ordered Clay to pull over. As Clay commenced to obey this peremptory command, the Government car cut in front of him so that, fore and aft, he was hemmed in by Revenue Agents. When the vehicles stopped, an Agent ordered Clay out of his car and then, with the first show of gentle concern, asked if they could search the car, to which Clay offered no objection. Within about two minutes, the search was made but revealed nothing. While Clay was standing near the front fender, the Agent-in-Charge, "asked him if he would permit us to search his person." Clay, without answering, reached in his pocket, took out some money, laid it on the fender of the automobile, and, about that time, while he was fumbling with his shirt pocket which contained a package of cigarettes, a small Manila-backed booklet in the shirt pocket was moved

---

per, certificate, or instrument purporting to be or to represent a ticket, chance, share, or interest in * * * a lottery * * *" is a specific offense, 18 U.S.C.A. § 1301. But the lottery here was a purely Georgia affair.

Numerous laws provide that where a Federal tax in respect of goods, or commodities, etc., has not been paid, the goods and other property may be subject to forfeiture: e. g., in 1939 Code 26 U.S.C.A. §§ 3321(b), 2803(f), 2806(c), 2803(f) (1), 3173, 3072, 2876, 3720(a), 3322, 3323(b), 3793(a) (2); 18 U.S.C.A. § 545; and, under 49 U.S.C.A. §§ 781, 782, transportation and carriage of contraband by vessel, vehicle, or aircraft subjects the vehicle to forfeiture; but "contraband" is statutorily defined to comprise only (1) narcotic drugs, (2) firearms subject to the National Firearms Act, (3) forged, altered, counterfeit coins or securities of the United States or foreign governments and paraphernalia for counterfeiting. Whether driving an automobile in some phase of the Numbers lottery business, cf. United States v. Lane Motor Company, 344 U.S. 630, 73 S. Ct. 459, 97 L.Ed. 622; United States v. One 1951 Cadillac, D.C.E.D.Mo., 125

F.Supp. 661, brings the vehicle under 26 U.S.C.A. § 3116 (1954 Code may be broader, 26 U.S.C.A. § 7302) which provides, "It shall be unlawful to have or possess any liquor or property intended for use in violating the provisions of this part, or the internal-revenue laws, * * or which has been so used, and no property right shall exist in any such liquor or property * * *", it is clear that this statute, if it declares a "crime" at all, does not prescribe either a misdemeanor or felony grade to such act of use or possession. By its terms the right of seizure requires a search warrant under Title XI, Act June 15, 1917, 40 Stat. 228, since repealed, Act June 25, 1948, c. 645, § 21, 62 Stat. 862, now covered by 18 U.S.C.A. §§ 2235, 1621, 2231, 2234, 3105, 3109, Rule 41, Fed.R. Crim.P. which establishes the usual test of a misdemeanor in the officer's presence or knowledge of a past felony. As the only penalty is forfeiture, the "unlawful" use or possession is neither misdemeanor nor felony and no basis exists for the exemption, United States v. Jeffers, 342 U.S. 48, 51, 72 S.Ct. 93, 96 L. Ed. 59, 64, for a valid warrant.

sufficiently for the Agent-in-Charge to see that it contained a row of three-digit numbers in pencil. Reacting as though he had found a strike, the Agent then announced that Clay was under arrest,[4] demanded possession of the booklet, and after admitting that he had no search warrant, forceably took it from Clay's hand. The further search of Clay's person uncovered five adding machine tapes [5] (called lottery ribbons) in the upper lapel pocket of his coat. One Agent reached in a pocket and brought out a roll of bills totaling $1,438.00. Later that day, he was taken before the Commissioner on a verified Complaint [6] of one of the Agents.

This analysis then brings the case to the point where the Government, for misdemeanor or felony, not only may but *must* find support for the seizure in the pre-January 28 activities. For there was nothing about his conduct on the highway that day, at that time, to indicate that he was then in the act of committing either misdemeanor or felony. He might have been going to, or coming from, a place where he had or would accept a wager. He might have been going to a place to pay over, or receive, money to or from the banker or pickup man in a lower or higher echelon of this vicious hierarchy. But at the moment he was not taking or receiving, collecting or paying wagers. And if the act of driving from one place to the other was to "be engaged in or carry on [the] trade or business * * *," 26 U.S.C.A. § 3271; Lewis v. United States, supra, this was not evident or discernible from what could then be seen or known. Moring v. United States, 5 Cir., 40 F.2d 267; Emite v. United States, 5 Cir., 15 F.2d 623.

Nothing discernible to the senses taught reasonably that crime was then being done *until* the Agent saw, and demanded, the lottery booklet. But this was too late, for the strong arm of the law had peremptorily stopped this traveler and placed him under evident, immediate command of Government officers. Clay was not only permitted to submit to this demonstrated show of force, but maintenance of law and order, avoidance of outright physical challenge of the authority of a policeman, a decent respect for the settlement of such controversies by orderly judicial processes, all justified Clay's acquiescence in their commands and requests, United States v. Di Re, 332 U.S. 581, 594, 68 S.Ct. 222, 92 L.Ed. 210, 220; United States v. Rembert, D.C.S.D.Tex., 284 F. 996. A citizen was forceably run down and driven off the highway. If officers have the

4. From the Officer's point of view, the arrest did not come until after discovery of the booklet. The Agent-in-Charge testified:

"A. After I noticed that [the booklet], I told Mr. Clay that he was under arrest; and asked him to hand me that booklet. He asked me if I had a search warrant and I told him no.

"Q. You put him under arrest before you asked for this book. A. Yes, sir. When I observed those numbers, I placed him under arrest at that time, and asked him to hand me the book * * *. The moment that I observed these 3-digit numbers on this small book; * * * that's when I placed him under arrest."

The Government's brief states: " * * * Clay * * * was actually seen by the officers with a lottery book in his pocket before he was arrested * * *."

5. On the hearing of the motion to suppress, the Revenue Agents, qualifying as experts, demonstrated how the gross collections less the pickup man's 25% commission tied into sheets and entries in the Manila booklet which also contained entries of the "Bug" (winning) number for January 26, 27, 28, 1954, based on the particular digits shown in the daily newspapers for those dates on the bond sales and stock sales in the New York market.

6. The Complaint is headed "Complaint for Violation of USC Title 16 [sic] Section 3290, 3291(a)" stating: "That on or about January 28th, 1954 * * * Clay did (here insert statement of the essential facts constituting the offense charged) fail to register as a person engaged in the business of accepting wagers prior to engaging in such business of accepting wagers, and *did fail to purchase* an occupational tax stamp as required by law * * *."

right to interfere with that essential pursuit of a nation of automobilists, it must be based on what is known or reasonably believed before the commandeering starts. To allow justification to rest on discovery after intrusion would permit "the Government * * * to justify the arrest by the search and at the same time to justify the search by the arrest," Johnson v. United States, 333 U.S. 10, 16, 68 S.Ct. 367, 370, 92 L.Ed. 436, 442. United States v. Frisch, 5 Cir., 140 F.2d 660, 662.

■ So, whether, as claimed by the Agents, the little booklet came to light as Clay was apparently complying with a mere request to disgorge his personal effects or, as claimed by him, it was done by peremptory command, if it was unlawful to stop him, the "conclusion is inescapable that the same unwarranted and unlawful force and compulsion, which attended and vitiated the stopping of the automobile * * *, attended and vitiated * * *," Ray v. United States, 5 Cir., 84 F.2d 654, 656, the production of the lottery booklet, the arrest and seizure of the other papers; Ward v. United States, 5 Cir., 96 F.2d 189.

■ Was the knowledge of prior events [7] sufficient to make an apparently innocuous use of a free highway, Emite v. United States, supra, a telltale of a past or current crime? The inquiry eliminates the question of misdemeanor since, for the misdemeanor to have been committed in the presence of the officer, it is necessary that "the officer has evidence by his senses sufficient to induce a belief

**7.** The Agents knew that ten years before, 1944, in a Macon Municipal Court, Clay was convicted of a misdemeanor charge of violating a Georgia law on lotteries; and knew, of course, of his conviction (see note 1, supra) for the July 8, 1953, occurrence at which time they had seen him in possession of lottery paraphernalia. Clay was reputed by law enforcing agencies to be engaged in the lottery business and, from confidential informants, United States v. Li Fat Tong, 2 Cir., 152 F.2d 650; King v. United States, 9 Cir., 1 F.2d 931, 932; Cannon v. United States, 5 Cir., 158 F.2d 952, certiorari denied 330 U.S. 839, 67 S Ct. 980, 91 L.Ed. 1286, they had been told that Clay was using Hester's store-residence on the Macon-Columbus highway as a place to check the daily settlement of receipts, disbursements, and the l'ke.

Special surveillance started September 22, 1953. At 1:30 p. m. Clay was seen leaving the Macon address at which the July 8, 1953 search and seizure, ultimately held unreasonable, was made. On leaving he placed a package in his black Oldsmobile and proceeded west on Columbus highway. The next day, September 23, 1953, two Agents, stationed on the Columbus highway near Hester's store-residence, saw Clay approach in his black Oldsmobile. Shortly this car was found parked at Hester's store. Clay returned to Macon 4:00 p. m. On October 7, 1953, two Agents were concealed on Columbus highway near Hester's store. At 2:05 p. m. two Negroes driving a Buick, parked on the highway, opened up the turtlebacked trunk of the car, and shortly, Clay arrived in his Oldsmobile. He took a paper bag from the Oldsmobile, put it in the trunk of the Buick, and then left in the Buick driving in the direction of Hester's store where the Buick was soon found parked and where it remained until about 4:00 p. m. On January 21, 1954, two Agents, concealed near the vicinity of Hester's store, saw Clay drive his Buick going in that direction, returning a few minutes later driving toward Macon. January 26, 1954, these same two Agents, at the same advantage point, saw Clay driving in the direction of Hester's store (but which was not visible to them) returning about five minutes later going toward Macon. January 27, these two Agents took posts keeping the Columbus highway and Hester's store under separate view. At 2:45 Clay driving his Buick from Macon proceeded toward Hester's store where he arrived 2:55, parked his car, remained three minutes, and then departed for Macon, passing the highway vigil in a few minutes.

The Agents at Macon kept their supervisor in Atlanta posted. He came to Macon January 28, 1954, and set up the catch. He had verified from the District Collector's records that no registration had been filed by Clay or gambler's occupation tax paid. The record is silent on search of Government revenue records to determine whether the 10% excise tax was being, or had been, paid.

in him * * *," United States v. Rembert, supra [284 F. 1006]; McBride v. United States, 5 Cir., 284 F. 416, certiorari denied 261 U.S. 614, 43 S.Ct. 359, 67 L.Ed. 827, and what they could see or sense was the movement of a car on a highway.

Examining it from the standpoint of a felony, there are two points: (1) did the officers actually believe that a felony had been committed, and (2) was there a reasonable probable ground for that conclusion?

The first is of extreme importance for if an officer does not in fact at the moment entertain a genuine good faith belief of this fact (or legal conclusion), then the action taken is itself unlawful because lacking in the indispensable ingredient which excused the issuance of a warrant by a magistrate. Johnson v. United States, supra; United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59. All that protects the citizen from unwarranted intrusion is the expectation that an officer, zealous and energetic as he may be, will nonetheless feel restrained by law and act only where his belief is genuine and in good faith. If he may act without it, liberty is exposed to the peril of a police state in which high-handed acts of the policemen consciously undertaken in indifference to law, may yet turn out to be justified by the leisurely post-event inquiry and investigation made, not by the officer, but by Government lawyers defending his acts.

If that is so, then all of the acts of these officers indicated that they did not entertain a belief that a *felony* had been committed. First, nothing they saw that day, gave them the right to draw an inference not held the day before. Despite the long and careful surveillance, the plan for the trap of January 28 was evidently thought to be essential to them in the making of a successful case. Running Clay off the highway, peremptorily ordering him about, subjecting his automobile to a "voluntary" search was in no way precipitated because of flight, hot pursuit, or the likely loss of evidence. Indeed, if the knowledge of prior events justified inferences of likely violation of the Wagering Tax Act, the pattern of Clay's actions demonstrated that near 2:00 o'clock each day, he would make this trip toward Hester's store and shortly return to Macon. Nothing about Clay's conduct on January 28 or evidence gleaned from other sources, confidential or otherwise, afforded any basis for believing that this was the last and only chance to catch him. The trap was, therefore, presumably set to obtain [8] evidence, the absence of

---

8. The Agent-in-Charge was pressed on cross examination:

"Q. In other words, you were detaining Clay, that was the purpose; you meant to stop him and detain him and see what he had, didn't you? That's what you meant to do when you did stop him? A. (no answer)

"Q. Mr. Register, you had no other reason to stop him except to search him, did you. A. We stopped him, based upon all the information we had at hand, which I have recited here.

"Q. I know but you didn't know he had this book in his pocket, of course, did you? A. We didn't know specifically what he had.

"Q. And you didn't know he had these tapes, these adding machine tapes, did you? A. No, sir.

"Q. And you didn't see them in his pocket when you made him pull over to the side of the road and stop? A. We had reason to believe that he had lottery paraphernalia on him.

"Q. I mean Mr. Register, you didn't know he had it on him though; you hadn't seen it? A. No, sir, I hadn't seen it.

"Q. It wasn't known to any of your senses, through any of your senses, that he had this material on him? A. No, sir.

"Q. But you were going to stop him and see what he had on him; isn't that true? A. Yes, sir, we were attempting to enforce the law.

"   *   *   *   *   *.

"Q. You meant to stop him for the purpose of searching him and his car,

which made their case and belief incomplete. Nothing new having come from the event of January 28 except the fruits of the forceable search, the failure to apprehend this well-known, dissolute, small-time gambler at his known residences undermines any possible claim that at that time they concluded that he had committed a felony. And this was corroborated beyond all doubt by the contemporaneous Complaint filed before the Commissioner (see note 6, supra). At most, it charged only a misdemeanor since an allegation that the accused failed to register and failed to purchase an occupational tax stamp is completely lacking in the essential allegation of the commission of affirmative acts, as distinguished from a mere negative omission, in the establishment of a scheme having as its purposeful objective the deliberate and intentional evasion of the taxing act, Spies v. United States, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418; Clay v. United States, supra; Contreras v. United States, supra; Mosely v. United States, supra; cf. Reynolds v. United States, supra.

And if it is assumed that the officers genuinely entertained a belief of probable cause, these same factors make these circumstances insufficient to justify a belief that a felony, not a previous misdemeanor, had taken place.

Of course, we are dealing here not with the sufficiency of evidence to sustain a felony conviction, or problems of criminal pleading, cf. Reynolds v. United States, supra; Clay v. United States, supra; Contreras v. United States, supra; Mosely v. United States, supra, or that which would permit a magistrate to determine whether probable cause existed in advance for warrant of arrest or to search. We are dealing with that situation in which the person claiming the right to draw the inference is the law enforcing officer whose zeal unfits him as a safe, impartial arbiter.[9]

As our decisions indicate, drawing the line between § 2707(b) and 2707(c) is difficult at best. To change the very act which is a misdemeanor into a felony requires a charge and proof of facts which " 'lifts the offense to the degree of felony.' Spies v. United States * * *," and " * * * some affirmative act on the part of the defendant showing an attempt to evade the imposition of the tax * * *," and conduct, " * * * the likely effect of which would be to mislead or conceal * * *," Clay v. United States, supra [218 F.2d 485, 486]. And since, "The addition of mere legal conclusions, unaided by essential allegations of fact to support [this inference] will not supply this ingredient," Clay v. United States, supra, then the mere assertion [10] now by the seizing officers of the legal conclusion that the circumstances known

didn't you; that's what you did it for. Now that's a fair question, isn't it, Mr. Register? A. Yes, sir."

9. Johnson v. United States, 333 U.S. 10, 13, 68 S.Ct. 367, 369, 92 L.Ed. 436, 440: "The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search

without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. * * * When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent * * *."

10. On the hearing, none of the Agents testified that, immediately prior to the curbing of Clay's car, he believed that Clay had committed a felony. At most it was that Clay had violated the law—a statement inadequate where distinction between the grades of crime is decisive and where, unlike the more patent offenses of physical acts, the shading between felony and misdemeanor is so delicate.

to them (note 7, supra) amounted to an attempt to evade is insufficient. To justify arrest for a felony, the officer must have grounds for believing the existence of facts of " * * * the knowledge and intent required as elements of the felony under the statute," United States v. Di Re, 332 U.S. 581, 592, 68 S.Ct. 222, 227, 92 L.Ed. 210, 219.

Finally, while the ease and practicability of obtaining the warrant of arrest or to search, Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663, is no longer an invariable rule of thumb, United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653, availability of the safeguards afforded by an impartial, judicial magistrate is a factor bearing on reasonable, probable cause. That the subject of the search is an automobile (or an occupant) does not let down the bars altogether, Shurman v. United States, 5 Cir., 219 F.2d 282, certiorari denied 349 U.S. 921, 75 S.Ct. 661, 99 L.Ed. 1253; Rent v. United States, 5 Cir., 209 F.2d 893, especially where the automobile is not the present means of flight, of likely destruction of evidence, or where the transportation [11] itself is not a crime. Paradoxically, all of the information now claimed to have justified the conclusion that a crime had been committed demonstrated that Clay's actions

followed an almost fixed, habitual pattern of time, place and movement. In that, the use of the automobile was purely incidental. And, viewed from the vantage of knowledge held either January 27 or the forenoon of January 28, there was nothing to indicate that procuring warrants of arrest or search would thwart, or impede the efficient enforcement of law, or intrude upon the " * * * judgment of the officers as to when to close the trap * * *," United States v. Rabinowitz, 339 U.S. 56, 65, 70 S.Ct. 430, 435, 94 L.Ed. 653, 660. Apparently the officers thought the time to close in was the afternoon of January 28. In planning the catch, they were confident that he would be at his usual spots. And, of course, he was. If the officers thought that it would be best to apprehend him on the highway to, rather than from, Hester's store, or on the road instead of at Hester's store or his Macon house or place of business, resort to a Commissioner would have required no alteration in their plan of attack. Compliance with and enforcement of laws intended to secure basic freedoms to the citizen is as much the duty of the officer, Miller v. United States, 5 Cir., 230 F.2d 486, as is the successful making and prosecution of cases under those Federal statutes committed to his agency.

Reversed.

11. United States v. Di Re, 332 U.S. 581, 584, 587, 68 S.Ct. 222, 223, 224, 92 L.Ed. 210, 215, 216, points out that Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543, and its progeny, Husty v. United States, 282 U.S. 694, 51 S.Ct. 240, 75 L.Ed. 629, concerned search and seizure made under provisions of the National Prohibition Act, 27 U.S.C.A. § 1 et seq., in which "Transportation of liquor in violation of that Act subjected first the liquor, and then the vehicle in which it was found, to seizure and confiscation, and the person 'in charge thereof' to arrest * * *." So that " * * * the Carroll decision falls short of establishing a doctrine that, without such legislation [National Prohibition Act], automobiles nonetheless

are subject to search without warrant in enforcement of all federal statutes. This Court has never yet said so." The Court seems plainly to limit the Carroll case (and our similar ones, e. g., Cannon v. United States, 5 Cir., 158 F.2d 952, certiorari denied 330 U.S. 839, 67 S.Ct. 980, 91 L.Ed. 1286); cf. Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879, to situations in which transportation is itself a crime: "We see no ground for expanding the ruling in the Carroll case to justify this arrest and search as incident to the search of a car. We are not convinced that a person, by mere presence in a suspected car, loses immunities from search of his person to which he would otherwise be entitled."