**Nolan E. PATENOTTE, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 17573.**

United States Court of Appeals
Fifth Circuit.

May 15, 1959.

648

Robert B. Adam, Gulfport, Miss., for appellant.

Jack McDill, Asst. U. S. Atty., Robert E. Hauberg, U. S. Atty., Jackson, Miss., for appellee.

Before HUTCHESON, Chief Judge, and BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This is an appeal from a judgment of forfeiture of a "1956 International Tractor, Aluminum Trailmobile Refrigerated Trailer, 150 100-Pound Sacks of No. 2 Rye, 1364 One-Gallon Glass Jugs in Cartons, and 37 100-Pound Sacks of Cerelose 53 (Corn Sugar)." The libel

was brought under Sections 7301 and 7302, Int.Rev.Code of 1954, 26 U.S.C.A.[1]

Appellant raises two questions for our consideration by his contentions that his truck was the subject of an unlawful search by officers, and that the Government has not sustained its burden of showing that these goods were intended for an illegal purpose.

## I. The Search

▮▮▮ Investigators Langton and Dunn and others of the Alcohol and Tobacco Tax Unit in Gulfport, Mississippi, were engaged in a "raw materials" enforcement campaign on October 9, 1957. They were driving along about three miles southeast of Vidalia, Mississippi, about 11:00 a. m., when down the road toward them came a large 32-foot truck which they recognized as belonging to Appellant Patenotte. Langton said, "There's Quarles driving the truck. Let's stop it and see what's on it." They did. They asked Quarles, who was driving for Patenotte, to show them the invoices. He did. The papers disclosed that Quarles had a considerable quantity of rye, jugs and corn sugar in the truck. The investigators opened the side door of the truck and saw the sacks of rye and the cartons of jugs. Then they let him and the truck go. As there were many investigators involved in this campaign they radioed the news to others, and by 2:30 that afternoon the property was seized, on Patenotte's farm, by Investigators Shanks, Green and Supervisor-in-Charge West.

The District Court admitted the evidence concerning the circumstances of the search and also evidence as to the contents of the truck disclosed by the search. Appellant contends that as this search was in violation of his rights under the Fourth Amendment,[2] its fruits should have been excluded. Weeks v. United States, 1914, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652.

It does not detract from the importance of the Fourth Amendment to note at the outset that it does not prohibit all searches and seizures by Federal officers. To be stopped, and searched, is always an inconvenience at best, but it is not always unreasonable. Search of automobiles is justifiable under many situations. For example, Mr. Justice Jackson has noted that "regulations of traffic, identifications where proper, traffic census, quarantine regulations, and many other causes give occasion to stop cars in circumstances which do not imply arrest or charge of crime." Brinegar v. United States, 1949, 338 U.S. 160, 188, 69 S.Ct. 1302, 1317, 93 L.Ed. 1879 (dissenting opinion). Likewise, while there is uncertainty as to the permissible extent of a reasonable search after arrest, the law is clear that if an arrest is proper at least some accompanying search is reasonable. United States v. Rabino-

---

1. "(b) Raw materials.—All property found in the possession of any person intending to manufacture the same into property of a kind subject to tax for the purpose of selling such taxable property in fraud of the internal revenue laws, or with design to evade the payment of such tax, may also be seized, and shall be forfeited to the United States.

  *   *   *   *   *

"(d) Packages.—All property used as a container for, or which shall have contained, property described in subsection (a) or (b) may also be seized, and shall be forfeited to the United States.

"(e) Conveyances.—Any property (including aircraft, vehicles, vessels, or draft animals) used to transport or for the deposit or concealment of property described in subsection (a) or (b) may also be seized, and shall be forfeited to the United States." Int.Rev.Code of 1954, § 7301(b), (d), (e), 26 U.S.C.A.

"It shall be unlawful to have or possess any property intended for use in violating the provisions of the internal revenue laws, or regulations prescribed under such laws, or which has been so used, and no property rights shall exist in any such property. * * * *" Int.Rev.Code of 1954, § 7302, 26 U.S.C.A.

2. "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things. to be seized." U.S.Const. Amend. 4.

witz, 1950, 339 U.S. 56, 60–61, 70 S.Ct. 430, 94 L.Ed. 653; Agnello v. United States, 1925, 269 U.S. 20, 30, 46 S.Ct. 4, 70 L.Ed. 145; Carroll v. United States, 1925, 267 U.S. 132, 158, 45 S.Ct. 280, 69 L.Ed. 543; Weeks v. United States, 1914, 232 U.S. 383, 392, 34 S.Ct. 341, 58 L.Ed. 652. Also, all accept reasonable searches by customs officials of those crossing or entering from a national border. Carroll v. United States, supra, 267 U.S. at pages 151, 154, 45 S.Ct. at pages 284, 285; Ramirez v. United States, 5 Cir., 1959, 263 F.2d 385. The law also recognizes that the reasonableness of the search without a warrant of moving vehicles is to be judged differently from search of homes. See generally Carroll v. United States, supra; Brinegar v. United States, 1949, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879; Jones v. United States, 1958, 357 U.S. 493, 78 S.Ct. 1253, 2 L.Ed.2d 1514; Cannon v. United States, 5 Cir., 1946, 158 F.2d 952, certiorari denied 330 U.S. 839, 67 S.Ct. 980, 91 L.Ed. 1286; Hart v. United States, 10 Cir., 1947, 162 F.2d 74, 75; Clay v. United States, 5 Cir., 1956, 239 F.2d 196. This is due in part to a recognition of the inherent mobility of such "effects," but it is certainly true "that the subject of the search is an automobile (or an occupant) does not let down the bars altogether * * *, especially where the automobile is not the present means of flight, of likely destruction of evidence, or where the transportation itself is not a crime." Clay v. United States, supra, 239 F.2d at page 204.

The general standard of reasonableness of search of an automobile or truck without a warrant is one of "probable cause, that is, upon a belief, reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction * * *." Carroll v. United States, supra, 267 U.S. at page 149, 45 S.Ct. at page 283.

"Probable cause" does not mean that the officers must possess enough evidence in admissible form to convict the person whom they arrest or search. Brinegar v. United States, supra, 338 U.S. 160, 172–173, 69 S.Ct. 1302; Draper v. United States, 1959, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327; United States v. Heitner, 2 Cir., 1945, 149 F.2d 105, 106. The cases have discussed at least five factors, for example, which may be considered by the officers in establishing probable cause for a search: (1) the reputation of, or informant's reports concerning, the occupants, (2) a like reputation of the vehicle or owners, (3) the condition of the vehicle (e. g., heavily loaded), (4) information from reputable informers as to the existence and illegal purpose of the trip, and (5) the reputation of the location in which they are found. Brinegar v. United States, supra, 338 U.S. at page 166, 69 S.Ct. at page 1306; Carroll v. United States, supra, 267 U.S. at page 160, 45 S.Ct. at page 287; The Apollon, 1824, 9 Wheat. 362, 374, 22 U.S. 362, 374, 6 L.Ed. 111; Cervantes v. United States, 9 Cir., 1959, 263 F.2d 800, 804; Turner v. Camp, 5 Cir., 1941, 123 F.2d 840, 842. In the leading case of Carroll v. United States, supra, a search of an automobile for prohibition whiskey was held legal although the searching officers had no direct evidence that the car contained liquor. It did not appear heavily loaded and it was not being driven in an unusual manner. But it was going from Detroit to Grand Rapids, Michigan—and Detroit was known to be a source of liquor. The officers recognized the occupants as men who had offered to obtain whiskey for an officer in Grand Rapids a few months earlier, although they never did so. They recognized the car as the same one the men had driven that night. The Supreme Court held these facts were sufficient to constitute "probable cause" for the search.

Just so, in this case, the officers were informed regarding (1) the reputation of the driver, (2) the reputation and activities of the vehicle (and its owner), (3) their asserted observation that the motor sounded as if the truck were

heavily loaded, and (4) the reputation of the location, and probable destination of the truck. Just as in Carroll and Brinegar, however, they had no information regarding the specific purpose of *this* trip, nor the actual contents of the truck.

They knew that Quarles had previously been convicted of violating the internal revenue laws, and was personally known to the Investigators. They knew that the truck belonged to Patenotte. They had seen the truck "several times" before and had seen it being loaded with approximately 240 100-pound sacks of sugar a few months earlier in New Orleans. The truck trailer was 32 feet long and somewhat distinctive, and they recognized the license plate number and the little red sign on the back, "We stop at shacks and railroad crossings." Although Patenotte did not have a reputation as the operator of a still, he did have the reputation as a supplier, operated "Pat's Glassware" store in Cuevas, Mississippi, and had sold considerable quantities of sugar and jugs. They also knew the location of Patenotte's "farm," and knew that Quarles was driving the truck in that direction. This area was considered to be "the heart of the 'moonshine' community," and Dunn testified that of the 75 or 80 stills he had investigated in the two years he had been with the ATU, 50 were in the Vadalia vicinity. Although there is some dispute about the matter, and a heavily loaded truck is not as unusual as a heavily loaded car, the two investigators testified that the truck sounded as if it were heavily loaded as it came up the hill towards them.

We reaffirm that "if officers have the right to interfere with that essential pursuit of a nation of automobilists, it must be based on what is known or reasonably believed before the commandeering starts," Clay v. United States, supra, 239 F.2d at pages 200–201, but we think that all of these circumstances add up to one of reasonableness.

The search was lawful and its fruits were, and will be, admissible.

## II. The Intended Use

But information which may justify search may not be sufficient to sustain the Government's burden of proof at the trial on the merits for forfeiture. The two judicial inquiries are essentially different in nature as well as in the quantity and quality of evidence required. Brinegar v. United States, 1949, 338 U.S. 160, 172–173, 69 S.Ct. 1302, 93 L.Ed. 1879, supra. This is so even though its burden is but the lesser civil "preponderance of the evidence" rather than the criminal "beyond a reasonable doubt" standard. Lilienthal's Tobacco v. United States, 1878, 97 U.S. 237, 24 L.Ed. 901; Stagner v. United States, 5 Cir., 1952, 197 F.2d 992; United States v. One 1955 Mercury Sedan, 4 Cir., 1957, 242 F.2d 429; United States v. One 1954 Mercury 2-Door Sedan, D.C.E.D.Va.1955, 128 F.Supp. 891. The libel of forfeiture charged these materials with being "property * * * which shall be found in the possession or custody or within the control of any person, for the purpose of being sold," or "property found in the possession of any person intending to manufacture the same into property of a kind subject to tax for the purpose of selling such taxable property in fraud of the internal revenue laws, or with design to evade the payment of such tax," Int.Rev. Code of 1954, § 7301(a) and (b). The truck was charged as being "property * * * used to transport * * * property described in subsection (a) or (b)." § 7301(e). If such charge is established in fact the property becomes forfeit both under Section 7301 and Section 7302, which declares that "no property rights shall exist in any" property "intended for use" or "which has been so used" in "violating the provisions of the internal revenue laws" and possession of such property "shall be unlawful."

It was the suspicion of the Investigators that Patenotte was supplying raw materials to moonshiners. And, indeed, the mere possession of seven and one-half tons of rye—a quantity which the Agricultural Agent testified would sup-

ply the agricultural needs of the whole county for a year or more—is a circumstance which may be considered. More particularly is this so when it is carried on a truck along with 1,364 empty gallon jugs and 3,700 pounds of sugar—a combination which, as the Government's brief notes, "lacked only fire and water to constitute the entire ingredients necessary for the manufacture of moonshine whiskey."

In testing whether these and other circumstances were sufficient it must be remembered that the charge was that the Owner-Claimant Patenotte intended these supplies for sale to persons engaged in the manufacture of non-tax-paid liquor and not, as so common, for use by him in its manufacture. For the Government agents were quite free in admitting that Patenotte did not have a reputation as a moonshiner himself. This was made clear on the cross-examination of Fred D. Shanks, group leader of the Gulfport, Mississippi ATU office.

"Q. You testified earlier you never found any stills around his property. A. I said on his property.

"Q. On his property. Have you ever known Mr. Patenotte to be in the whisky business, to operate a still? A. No, sir.

"Q. He doesn't have any reputation for that? A. No, sir.

"Q. Does he have a reputation for selling or buying moonshine whisky? A. No, Sir."

Having thus limited its case to Patenotte's role as a supplier and transporter of contraband materials, the Government must prove it. What further evidence was introduced to substantiate this allegation? Investigator Dunn testified to "general information"

that Patenotte was a supplier. Langton testified that he had heard this from other agents, but he couldn't remember who, or when, or just what they had told him. He also had a tip from a confidential informer with a reputation as a moonshiner, whose name he refused to reveal, that raw materials were being kept on Patenotte's farm. Shanks testified that "mainly, my first source of information in this respect would be from other investigators of the Alcohol Tax Unit," although he, too, was unable to recall just what he had been told. He also testified to having "been told things" by "local officers, highway patrolmen and state officers who objected very strongly to me ever disclosing their identity," and by "private persons," all of whom were "reliable" and "credible."

All admitted that Patenotte had a license to carry on a glass business and was a legitimate farmer as well. No one had any information whatsoever regarding the specific contents of his truck on October 9, 1957, or their intended use.[3] Quarles, who admitted having made whiskey and being convicted for internal revenue violations, testified that he had no knowledge that Patenotte was selling supplies to moonshiners, and that he had never bought any from him. He also testified that he thought this sugar was to be used for hog feed (at 3¢ a pound, rather than the more common blackstrap syrup at 30¢), that it was (as the agents agreed) unfit for human consumption, that he had never made any whiskey from sugar of that type, and didn't know of anybody else who had. To this was added the ironic fact that the ATU had at one time sold Patenotte 200 forfeited glass gallon jugs, presumably with no intention that they be used in an illegal business.

---

3. "Q. (Defense counsel) I believe you testified earlier that you had no information on this particular truck being used in violation of the internal revenue laws, is that correct? A. (Investigator Langton) At this particular time.
"Q. At the seizure, you had no information on that tractor and truck? A. I

had seen the truck prior to the seizure being used to transport sugar from an ice cream company.
"Q. Yes, sir. You don't know what the sugar was being used for, do you? Do you know what the sugar was being used for? A. No, I can't definitely state what it was going to be used for."

In addition to admitting that Patenotte did not even have a *reputation* as a still operator or dealer in whiskey, Langton testified that they had never received any complaints regarding Patenotte's activity and that he had never given them any trouble. Dunn testified that he, at least, had never talked with Patenotte. Although he had been under investigation by the ATU for "several months" the agents had been unsuccessful in finding anything illegal in his operations.

In addition to this loose, general hearsay testimony, the other evidence was of a guilt-by-association character. Langton testified that he had "information" that "the Broaduses were getting their supplies from" Patenotte. Although he admitted that "frankly, I don't know what his [Broadus] business is," he testified that L. L. Buster Broadus has "a record and reputation for violation of the internal revenue laws." Johnny Cash, whom Langton testified was a New Orleans sugar, jug, and barrel dealer, was at Patenotte's farm on March 20, 1957, and was seen loading a truck with sugar in New Orleans which he drove onto Patenotte's farm April 2, 1957. And Patenotte was seen with Johnny Cash loading sugar into Patenotte's truck on May 7. Jerry Wayne Johnson, whom Langton testified had been arrested for violating internal revenue laws, was seen driving a truck, apparently coming from Patenotte's drive in Pineville, Mississipi, about 2:30 a. m.—the still of the night—May 21, 1957. And Deputy United States Marshal Daniels testified that he served warrants on William Ernest Balius, "a known bootlegger," on Patenotte's farm in July 1957—though at the time he was digging a fish pond with a bulldozer and had not been operating a still.

Obviously some of these facts give rise to strong inferences, many perhaps indicating that under these circumstances Patenotte must have been trading in these materials for the purpose of supplying moonshiners of that area. Especially is that so in the face of complete silence by Patenotte showing his purpose for having these goods. Stagner v. United States, 5 Cir., 1952, 197 F.2d 992, 994; Kent v. United States, 5 Cir., 1946, 157 F.2d 1, certiorari denied 329 U.S. 785, 67 S.Ct. 297, 91 L.Ed. 673; United States v. One 1955 Mercury Sedan, 4 Cir., 1957, 242 F.2d 429, 431. Whether those inferences may be drawn and whether, if drawn, they are sufficient would ordinarily have to be determined by us in response to a claim of error, as asserted here, that the evidence was wholly inadequate.

But we think it inappropriate for us to undertake that here. The admissible has been so inextricably interwoven with the inadmissible that neither we nor the trial judge can, with assurance of fairness to Government and Claimant alike, safely assay this evidence either for its legal sufficiency or as the basis for possible factual inferences perhaps, but not necessarily, drawn. We cannot be at all assured that had the trial judge carefully hewed to the line of admissibility as to the merits, he would have drawn the inference of illicit purpose. For example, what reliable informants told the officers was certainly relevant and significant on the validity of the search. But on the trial of the merits it was wholly inadmissible hearsay on the crucial issue of purpose. Reputation of others might likewise have a relevance on both validity of search and on the merits. But the inherent difference in the two inquiries requires that for its use on the merits, the evidence of such reputation be in such form that it would have been admissible as such had it been an ordinary civil forfeiture case uncomplicated by a problem of illegal search.

We do not say that a District Judge, with the wisdom and experience and judgment inhering in that responsible office, may never try these two claims together. We do say, however, that where that is done the record must not leave doubt that the Judge was aware of the dual nature of the inquiry and the extent to which, in each, the various

types of evidence could and could not be properly used.

This record leaves considerable doubt. The interests of justice require that there be a new trial on the merits uninfected by problems of the search whose validity is now established. Bryan v. United States, 1950, 338 U.S. 552, 70 S. Ct. 317, 94 L.Ed. 335; Fireman's Fund Ins. Co. v. Wilburn Boat Co., 5 Cir., 1958, 259 F.2d 662, certiorari denied 359 U.S. 925, 79 S.Ct. 607, 3 L.Ed.2d 628.

Reversed and remanded.