Dohald H. Mead, J.
Defendant moves for an order permitting him to inspect the Grand Jury minutes, or, in the alternative, that the court inspect the minutes and upon such inspection by the court, that an order be granted dismissing the indictment. Upon stipulation of counsel, the court has examined the Grand Jury minutes in its consideration of this motion. The defendant was indicted by the Grand Jury of the County of Onondaga (Indictment No. 9137) charging a violation of section 975 of the Penal Law in that, on or about the 7th day of January, 1961, at the City of Syracuse, in this county, the said Floyd Hill, being then and there a private citizen and not a public officer, did on or about said 7th day of January, 1961, at the City of Syracuse, in this county, have in his possession, knowingly, certain writings, papers, documents, representing or being records of more than 10 chances, bets or wagers upon numbers sold in what is commonly called “ policy ” or the “ numbers game ”, and did knowingly have in his possession more than 10 policy slips, papers, writings and other articles such as are commonly used in carrying on, promoting and playing the game commonly called “policy”. The crime charged in the indictment is by law a misdemeanor under section 975 of the Penal Law.
*986 Defendant in Ms moving affidavit alleges: ‘‘ That the arrest of your deponent took place in the following manner: That on or about January 7, 1961 between 9:30 and 10:00 o’clock in the morning of that day, your deponent was driving an automobile on Jefferson Street between the intersection of that street with Montgomery and State Streets. That the car which he was driving was halted by persons unknown by name to your deponent but who identified themselves as members of the Syracuse Police force. That no warrant was exhibited to your deponent at the time of his arrest. That one of the officers stated to Mm in substance, ‘ Let me see your registration and license? ’ That your deponent produced his wallet in which these documents were kept whereupon the person identifying himself as a police officer grabbed the wallet from your deponent, and went through the contents of same. That certain items alleged to be policy slips were taken from deponent’s wallet. That your deponent was then and there placed in a police ear and questioned as to where he lived. That upon giving said address, he was driven there and accompanied inside by the officers. That your deponent did not give permission for the officers to enter his home, nor was any search warrant or other type of process exhibited to him.”
Since the aforesaid allegations of defendant are not denied nor controverted in the People’s answering affidavit and since the testimony before the Grand Jury is barren of any circumstances leading to and surrounding the defendant’s arrest, the allegations, contained in defendant’s affidavit must be deemed to be true.
Prior to 1938, in New York State, the immunity against unreasonable searches and seizures was statutory. (Civil Eights Law, § 8.) In 1938 section 12 of article I of the New York State Constitution was adopted which provides in part as follows: “The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to. be seized.” Thus, the statutory immunity so conferred, was incorporated into the State Constitution. However, the immunity is not from all search and seizure, but from such search and seizure unreasonable in the light of common-law traditions. (People v. Chiagles, 237 N. Y. 193, 195.) The Government may “search the person of the accused when legally arrested to discover and seize the fruits *987 or evidences of crime”. (Weeks v. United States, 232 U. S. 383, 392; People v. Chiagles, supra. Emphasis supplied.)
In the case of People v. Defore (242 N. Y. 13) the court, although adhering to the rule which permitted the receipt of illegally obtained evidence upon the trial of the indictment, in affirming the order denying a motion made prior to trial to suppress evidence, nevertheless, held that the search of defendant’s room was unreasonable “in the light of common law traditions ”. In that case a police officer arrested the defendant on a charge that he had stolen an overcoat. The crime, if committed, was petit larceny, a misdemeanor, for the value of the coat was not over $50 (Penal Law, §§ 1296, 1298; Cons. Laws, ch. 40). The defendant when taken into custody was in the hall of his boardinghouse. The officer after making the arrest entered the defendant’s room and searched it. The search produced a bag, and in the bag was a blackjack. The defendant after trial at Special Sessions was acquitted of the larceny. In the meantime he had been indicted as a second offender for the possession of the weapon (Penal Law, § 1897). He made a motion before trial to suppress the evidence obtained through search without a warrant. The motion was denied. Cabdozo, J., writing for the court, stated at page 18: “ (1) The search was unreasonable ‘ in the light of common law traditions ’ (People v. Chiagles, 237 N. Y. 193). A different conclusion might be necessary if the defendant had been lawfully arrested. As an incident to such an arrest, his person might have been searched for the fruits or evidences of crime (People v. Chiagles, supra; Carroll v. U. S., 267 U. S. 132, 158). So, it seems, might the place where the arrest was made (Agnello v. U. S., 269 U. S. 20; People v. Cona, 180 Mich. 641). But the arrest was not lawful. One who, acting without a warrant, arrests for a misdemeanor, exceeds the bounds of privilege, whether he be a private person or an officer, unless the crime has been committed or attempted in his presence (Code Crim. Pro., §§ 177, 183). The defendant had neither committed the crime of petit larceny in the presence of the officer, nor there attempted to commit it. * * * There was no lawful arrest to which the search could be an incident. ’ ’
Clearly, in the case at bar, “there was no lawful arrest to which search could be an incident ”. The crime charged is a misdemeanor. There is no evidence that it was being committed or being attempted in the presence of the officers when the arrest was made. (Code Grim. Pro., §§ 177, 183.) Means unlawful in their inception do not become lawful by relation when suspicion ripens into discovery. (People v. Defore, supra.) In the case at bar, the facts known when the arrest occurred *988 were wholly insufficient to engender reasonable belief that defendant was committing a misdemeanor and the legality of the arrest cannot be supported by facts ascertained through the search which followed.
The People argued that “ a search of a moving vehicle has been held to be valid upon a finding of probable cause, since the necessity for fast action is satisfied by the inherent mobility of vehicles ”, citing in support of their contention, Clay v. United States (239 F. 2d 196 [5th Cir.]); Carroll v. United States (267 U. S. 132); Husty v. United States (282 U. S. 694). The Carroll and Eusty cases cited deal with statutes enacted to enforce the 18th Amendment which made it unlawful to have and possess any liquor intended for use in violating the act and which gave the Government and its duly authorized agents, upon discovery, the right to seize as contraband any intoxicating liquors being transported in violation of the law in any wagon, buggy, automobile, water or aircraft, or other vehicle. Those two cases cited turned upon express provisions of applicable acts of Congress; they did not involve the point here presented and afford little, if any, assistance toward its proper solution. This is not a case involving the seizure and forfeiture of contraband goods under a proper legislative enactment. The Legislature has frequently empowered officers to search for contraband and to arrest without warrant for certain offenses, which perhaps tends to show that, in its opinion, no such right exists at common law. Striking examples are statutes permitting the seizure of goods forfeited for a breach of the revenue laws or concealed to avoid the duties on them; the supervision authorized to be exercised by officers of the revenue over manufacture or custody of excisable articles; the power and authority conferred upon every collector, naval officer and surveyor to enter any ship or vessel in which they have reason to suspect any goods, wares or merchandise subject to duty shall be concealed. So, also, the power and authority to search for and seize contraband liquor and to arrest the possessor as provided in the prohibition statutes. (Carroll v. United States, 267 U. S. 132, supra.) These are but a few examples of visitorial powers to search conferred upon officers by statute. However, no statute has been called to our attention nor has the court been able to discover any statutory authority to justify a search for policy slips (the possession of which constitutes a misdemeanor) upon suspicion and without a warrant.
The facts in the case of Clay v. United States (239 F. 2d 196, supra), cited by the People, closely parallel the facts in this case. In the Clay case, the defendant was prosecuted for failure *989 to register as a person engaged in the business of accepting wagers prior to engaging in such business and for failure to purchase a Federal occupational tax stamp as required by law. Defendant moved to suppress certain evidence on the ground of unlawful seizure. The United States District Court for the Middle District of Georgia denied the motion and the defendant appealed. The defendant Clay had a lengthy record of taking, handling and placing of wagers and dealing in policy and lotteries, all of which was well known to the arresting officers. The Court of Appeals, in reversing, stated at pages 199-202:
1 ‘ All of this is important since the mere act of a known gambler driving an automobile on a public highway will not justify an officer forcing him to stop to be searched or arrested for a suspected violation of the Federal Wagering Tax Act.
“ And yet that is all that occurred on January 28. Revenue Agents in two passenger cars, one privately owned, one Government owned but with no identification of its official status discernible to passing or overtaken vehicles, took up a concealed vigil on the Macon-Columbus highway about a mile east of Hester’s store-residence in anticipation that, following his frequent pattern, Clay would go there for a brief stay about 2:00 o’clock in the afternoon. Clay passed this point in his Buick, driving in a normal manner at moderate speed. The two cars fell in behind him, but on attempting to overtake and stop him, Clay, saying that he was apprehensive of highway robbery, shot up his speed to 60 to 70 m.p.h., allowed his car to slip partially over in the left-hand lane across the center stripe to force the Agents ’ cars back, but almost immediately returned to his own lane. The Government car came abreast of Clay and the Agent pounding on the right-hand front door of the Government car (with a pistol, Clay said; by bare hand according to the Agent) ordered Clay to pull over. As Clay commenced to obey this peremptory command, the Government car cut in front of him so that, fore and aft, he was hemmed in by Revenue Agents. When the vehicles stopped, an Agent ordered Clay out of his car and then, with the first show of gentle concern asked if they could search the car, to which Clay offered no objection. Within about two minutes, the search was made but revealed nothing. While Clay was standing near the front fender, the Agent-in-Charge, ‘ asked him if he would permit us to search his person.’ Clay, without answering, reached in his pocket, took out some money, laid it on the fender of the automobile, and, about that time, while he was fumbling with his shirt pocket which contained a package of cigarettes, a small Manila-backed booklet in the shirt pocket was moved sufficiently for the Agent-in- *990 Charge to see that it contained a row of three-digit numbers in pencil. Reacting as though he had found a strike, the Agent then announced that Clay was under arrest, demanded possession of the booklet, and after admitting that he had no search warrant, forceably took it from Clay’s hand. The further search of Clay’s person uncovered five adding machine tapes (called lottery ribbons) in the upper lapel pocket of his coat. One Agent reached in a pocket and brought out a roll of bills totaling $1,438.00. Later that day, he was taken before the Commissioner on a verified Complaint of one of the Agents.
44 This analysis then brings the case to the point where the Government, for misdemeanor or felony, not only may but must find support for the seizure in the pre-January 28 activities. For there was nothing about his conduct on the highway that day, at that time, to indicate that he was then in the act of committing either misdemeanor or felony. He might have been going to, or coming from, a place where he had or would accept a wager. He might have been going to a place to pay over, or receive, money to or from the banker or pickup man in a lower or higher echelon of this vicious hierarchy. But at the moment he was not taking or receiving, collecting or paying wagers. And if the act of driving from one place to the other was to 4 be engaged in or carry on [the] trade or business * * *,’ 26 U. S. C. A. § 3271; Lewis v. United States, supra, this was not evident or discernible from what could then be seen or known. Moring v. United States, 5 Cir., 40 F. 2d 267; Emite v. United States, 5 Cir., 15 F. 2d 623.
44 Nothing discernible to the senses taught reasonably that crime was then being done until the Agent saw, and demanded, the lottery booklet. But this was too late, for the strong arm of the law had peremptorily stopped this traveler and placed him under evident, immediate command of Government officers. Clay was not only permitted to submit to this demonstrated show of force, but maintenance of law and order, avoidance of outright physical challenge of the authority of a policeman, a decent respect for the settlement of such controversies by orderly judicial processes, all justified Clay’s acquiescence in their commands and requests, United States v. Di Re, 332 U. S. 581, 594, 68 S. Ct. 222, 92 L. Ed. 210, 220; United States v. Rembert, D. C. S. D. Tex., 284 F. 996. A citizen was forceably run down and driven off the highway. If officers have the right to interfere with that essential pursuit of a nation of automobilists, it must be based on what is known or reasonably believed before the commandeering starts. To allow justification to rest on discovery after intrusion would permit 4 the *991 Government * * * to justify the arrest by the search and at the same time to justify the search by the arrest, ’ Johnson v. United States, 333 U. S. 10, 16, 68 S. Ct. 367, 370, 92 L. Ed. 436, 442. United States v. Frisch, 5 Cir. 140 F. 2d 660, 662.
11 [4] So, whether, as claimed by the Agents, the little booklet came to light as Clay was apparently complying with a mere request to disgorge his personal effects or, as claimed by him, it was done by peremptory command, if it was unlawful to stop him, the 1 conclusion is inescapable that the same unwarranted and unlawful force and compulsion, which attended and vitiated the stopping of the automobile * * *, attended and vitiated * * Ray v. United States, 5 Cir. 84 F. 2d 654, 656, the production of the lottery booklet, the arrest and seizure of the other papers; Ward v. United States, 5 Cir., 96 F. 2d 189.
“ [5] Was the knowledge of prior events sufficient to make an apparently innocuous use of a free highway, Emite v. United States, supra, a telltale of a past or current crime? The inquiry eliminates the question of misdemeanor since, for the misdemeanor to have been committed in the presence of the officer, it is necessary that ‘ the officer has evidence by his senses sufficient to induce a belief in him * * United States v. Rembert, supra [284 F. 1006]; McBride v. United States, 5 Cir., 284 F. 416, certiorari denied 261 U. S. 614, 43 S. Ct. 359, 67 L. Ed. 827, and what they could see or sense was the movement of a car on a highway.”
Also, at page 204 of the opinion, the court said: “ That the subject of the search is an automobile (or an occupant) does not let down the bars altogether, Shurman v. United States, 5 Cir. 219 F. 2d 282, certiorari denied 349 U. S. 921, 75 S. Ct. 661, 99 L. Ed. 1253; Rent v. United States, 5 Cir., 209 F. 2d 893, especially where the automobile is not the present means of flight, of likely destruction of evidence, or where the transportation itself is not a crime.”
The cases cited by the People holding that “ consent to search constitutes a waiver of rights secured by the 4th amendment,” have no application to this case. Under the facts in this case it is clear that the defendant did not consent to a search of his person.
Following the enactment of section 12 of article I of the New York State Constitution and, indeed, until the recent decision of the United States Supreme Court in the case of Mapp v. Ohio (367 U. S. 643), our courts have followed the rule, previously enunciated under section 8 of the Civil Bights Law, that evidence illegally secured may be received upon the trial since the court did not take notice of the manner in which witnesses *992 have possessed themselves of papers or other articles of personal property which are material and properly offered in evidence. (People v. Richter’s Jewelers, 291 N. Y. 161, 166; People v. Adams, 176 N. Y. 351, 358; People v. Defore, supra.)
In 1914 the United States Supreme Court held in the case of Weeks v. United States (232 U. S. 383, supra), that in a Federal prosecution, the Fourth Amendment barred the use of evidence secured through an illegal search and seizure. This rule has ever since been followed by the Supreme Court. (Cf. Silverthorne Lbr. Co. v. United States, 251 U. S. 385 [1920]; Byars v. United States, 273 U. S. 28 [1927]; Olmstead v. United States, 277 U. S. 438 [1928].)
In 1949, 35 years after the Weeks case, the United States Supreme Court in Wolf v. Colorado (338 U. S. 25) for the first time, discussed the effect of the Fourth Amendment upon the States through the operation of the due process clause of the Fourteenth Amendment. It said: ‘ ‘ [W] e have no hesitation in saying that were a State affirmatively to sanction such police incursion into privacy it would run counter to the guaranty of the Fourteenth Amendment ” (p. 28). Nevertheless, after declaring that the “ security of one’s privacy against arbitrary intrusion by the police ” is “ implicit in ‘ the concept of ordered liberty ’, and as such enforcible against the States through the Due Process Clause ” (cf. Palko v. Connecticut, 302 U. S. 319 [1937]) and announcing that it “stoutly adhere[d] ” to the Weeks decision, the court decided that the Weeks exclusionary rule would not then be imposed upon the States as “ an essential ingredient of the right.”
In 1960 the court, in the case of Elkins v. United States (364 U. S. 206), discarded the doctrine which allowed Federal judicial use of evidence seized in violation of the Constitution by State agents and held that all evidence obtained by an unconstitutional search and seizure was inadmissible in a Federal court regardless of its source.
In the case of Mapp v. Ohio (supra), the court, in overruling the doctrine laid down in Wolf v. Colorado (supra) said at page 660: “The ignoble shortcut to conviction left open to the State tends to destroy the entire system of constitutional restraints on which the liberties of the people rest. Having once recognized that the right to privacy embodied in the Fourth Amendment is enforceable against the States, and that the right to be secure against rude invasions of privacy by state officers is, therefore, constitutional in origin, we can no longer permit that right to remain an empty promise. Because it is enforceable in the same manner and to like effect as other basic *993 rights secured hy the Due Process Clause, we can no longer permit it to be revocable at the whim of any police officer who, in the name of law enforcement itself, chooses to suspend its enjoyment. Our decision, founded on reason and truth, gives to the individual no more than that which the Constitution guarantees him, to the police officer no less than that to which honest law enforcement is entitled, and, to the courts, that judicial integrity so necessary in the true administration of justice.”
Stripped of the unlawfully obtained evidence there remained in this case nothing before the Grand Jury save the uncorroborated confession of the defendant.
Section 395 of the Code of Criminal Procedure provides that a confession of a defendant can be given in evidence against him under certain circumstances but it “is not sufficient to warrant his conviction without additional proof that the crime charged has been committed.” Having determined that the alleged policy slips found in the possession of the defendant cannot be used as evidence by reason of the unreasonable search and seizure there remained no other evidence of the commission of the crime except defendant’s confession. For the reasons above stated, the defendant’s motion to dismiss the indictment is hereby granted.