### UNITED STATES of America, Plaintiff-Appellee,

v.

### Robert Portsche WARD, Defendant-Appellant.

No. 72–3176.

United States Court of Appeals, Ninth Circuit.

April 5, 1973.

On Hearing En Banc Nov. 13, 1973.

---

James L. Vonasch (argued), Seattle, Wash., for defendant-appellant.

Irwin Schwartz, Asst. U. S. Atty. (argued), Stan Pitkin, U. S. Atty., Jerald E. Olson, Asst. U. S. Atty., Seattle, Wash., for plaintiff-appellee.

Before CHAMBERS and TRASK, Circuit Judges, and SCHNACKE *, District Judge.

SCHNACKE, District Judge:

Defendant was convicted of knowing possession of a false Selective Service registration card, 50 U.S.C. App. § 462(b)(5).

The evidence and defendant's stipulations in the trial court fully support the court's written findings that defendant had manufactured a false identity for himself under an assumed name, and that, as part of the scheme, he obtained and completed a falsely made Selective Service registration certificate which he had in his possession at the time of his arrest. The contention that the evidence is insufficient to support the charge is totally without merit.

The principal contention on this appeal is that the court below erred by receiving in evidence the false documents carried by defendant at the time of his arrest, and in denying defendant's motion to suppress directed to that evidence. The precise basis upon which defendant relies has not been succinctly stated either here or below, but the contention appears to be that the false documents were seized from, or involuntarily produced and displayed by defendant at a time when he was, or thought he was, under arrest, and prior to the time he was given the warning required by Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966).

The evidence, taken most favorably to the government, fails to support the contention.

FBI agents wanted to question defendant privately concerning some federal fugitives. No federal charges were outstanding against defendant. The agents knew defendant had been using the name "Gerald Clayton Washburn". While driving about in an unmarked car they saw defendant alone in a car and signalled him, by siren, to pull over, which he did. The agents approached his car, identified themselves, stated that they wanted to interview him about the fugitives and asked him to identify himself. Defendant asked if he was under· arrest, and was told he was not. Defendant produced a driver's license in the name of Washburn and was told by an agent there was no such person. Defendant then handed the agent a group of cards, as though to prove the agent wrong.

This was a mistake, because the top card was a Selective Service registration card also issued in the name of Washburn. Defendant was then placed under arrest for the crime here asserted.

The investigating officers stopped defendant to seek information from him, not to arrest him. Officers must be allowed to exercise their ingenuity and

judgment, in the light of their training and experience, in deciding when, where, how, and even with what flair or dramatics they question a witness they expect to be reluctant. It was entirely reasonable, and certainly no invasion of any right of defendants, to decide to question him when they found him alone, rather than at his residence (under the view of those being investigated) or at the office of the attorney for whom he worked.

Defendant complains most vigorously of the fact that he was signalled to stop by the siren of the FBI car. This certainly led him to believe that law enforcement officers wanted to see him, and might well have caused him to wonder if he were to be arrested. But when he asked if he was under arrest, he was told that he was not, and thereafter, he produced the false identification documents. It is implicit in the rulings of the trial judge that he found, on evidence conflicting but adequately supporting the findings, that up to that time there was no arrest, no search, and no compulsion, but rather a voluntary display of the counterfeit identification.

It is made plain by *Miranda, supra,* at pp. 477–478, 481, 86 S.Ct. at p. 1629, that its limitations were not designed to "hamper the traditional function of police officers in investigating crime". The evidence here obtained during investigation was properly received. See Lamb v. United States, 414 F.2d 250 (9th Cir. 1969).

The name a person is using, like his voice or his fingerprints, is a publicly displayed characteristic. Compelling the giving of handwriting or voice samples is not violative of the Fourth or Fifth Amendments. United States v. Dionisio, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973); United States v. Mara, 410 U.S. 99, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973).

However, the view we take of the case makes it unnecessary to consider whether *Dionisio* and *Mara* have application.

The judgment of conviction is affirmed.

TRASK, Circuit Judge (dissenting):

I respectfully dissent. In my opinion the F.B.I. agents acted unreasonably in stopping appellant's car for the purpose of interrogating him. The stop violated appellant's Fourth Amendment rights against unreasonable searches and seizures and unreasonably infringed on appellant's right as a motorist to be free from arbitrary disruption of unrestricted lawful travel. Terry v. Ohio, 392 U. S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

There can be no question that appellant's motion to suppress was directed at all evidence obtained by the government as a result of the stop—identification documents, fingerprints, handwriting exemplars and testimony of what appellant said and did during the stop. The majority opinion ignores the legality of the stop issue determining that appellant's primary argument is without merit—that the evidence should have been suppressed because a *Miranda* warning was not given soon enough. I am also unpersuaded by appellant's interpretation of *Miranda* and the warning requirement under the circumstances of this case. This court should not bypass a consideration of the legality of the stop, however, merely because appellant has raised that issue with less vigor. If the stop was illegal, then the evidence obtained as a result of the stop should have been suppressed.[1]

The stop of a vehicle can be an unreasonable seizure within the meaning of the Fourth Amendment because it intrudes on a driver's reasonable expectation of the right to proceed lawfully along the public streets and highways

---

1. The Motion to Suppress and the Memorandum and Supplementary Memorandum of Points and Authorities clearly show appellant's reliance upon the illegality of the stop as well as the failure to give proper *Miranda* warnings. He claimed the protection of the Fourth Amendment and of the Fifth Amendment.

without molestation by authorities except for cause. Beck v. Ohio, 379 U.S. 89, 94–95, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). And that cause may be no less than a founded suspicion. United States v. Mallides, 473 F.2d 859 (9th Cir., 1973). When federal agents pull a motorist off the road by use of a siren there has been a seizure even though the agents only intended to make a routine investigation. The question must be raised in every stop case whether the seizure was reasonable under the Fourth Amendment. In determining the reasonableness of such a stop, the courts must weigh the need for police action against the inconvenience and intrusion which the stop entails. Terry v. Ohio, *supra*; United States v. Leal, 460 F.2d 385 (9th Cir.), cert. denied, 409 U.S. 889, 93 S.Ct. 154, 34 L.Ed.2d 146 (1972).

With these general principles in mind, a review of the facts of this case is crucial in assessing the reasonableness of the challenged stop. The evidence at the suppression hearing established that:

(1) F.B.I. agents knew where appellant lived and had known for a number of months prior to April 4, 1972.

(2) The agents knew appellant's car by make, model, color, year and license number. .

(3) The agents presumably knew appellant had worked as a typist for a practicing lawyer, but no effort was made to contact the appellant at that office or through the attorney.

(4) The agents knew that appellant was using the name Gerald Clayton Washburn and had known for a number of months. Appellee acknowledges that it is not a crime in itself to assume a false identity.

(5) The agents knew that appellant had a Washington driver's license in the name of Gerald Clayton Washburn and had seen a copy of the driver's license in the state's records prior to April 4, 1972. (Washington driver's licenses have the driver's picture on them.) The agents were also aware that there were birth records in Seattle of a Gerald Clayton Washburn who had died as a child several years prior to April 4, 1972.

(6) Prior to April 4, 1972, the agents surveilled Ward on different occasions at his residence and wanted to interview him regarding a federal fugitive, William Ayres, who had been indicted in 1970 by a federal Grand Jury, but not in the presence of appellant's friends or acquaintances.

(7) On April 4, 1972, agents Woodlieg and Clark were driving around Capitol Hill with two other agents who were new to Seattle. The agents went by appellant's residence where appellant was spotted in his Volkswagen. The agents followed appellant to a co-op and then followed him after he left the co-op, catching up with him at a nearby intersection at a stop sign. The agents then turned on the siren in their unmarked car. Appellant turned around to look at them and they motioned him to go around the corner and stop. Appellant turned the corner and pulled over to the side of the road into a parking place. The agents stopped in the street behind appellant's Volkswagen but about five feet from the curb.

(8) All four F.B.I. agents exited the car and approached appellant. Agent Woodlieg testified that he and the other agents identified themselves, informed appellant that they wanted to interview him about federal fugitives and asked appellant to identify himself, already knowing that appellant was using the name Washburn and had a driver's license in the name Washburn. Appellant produced the driver's license and agent Woodlieg informed appellant that Washburn did not exist and that he could not be Washburn. Appellant, in response to this, shrugged his shoulders and then handed a stack of identification papers to Woodlieg as if to say, "What do you mean, of course I'm Washburn, see." Agent Woodlieg saw the top

identification which was a Selective Service Registration Certificate in the name of Washburn.

(9) Upon seeing the Selective Service card, Woodlieg advised appellant that he was under arrest, advised him of his rights and proceeded to frisk him. (10) Agent Woodlieg testified that prior to seeing the Selective Service card, he had nothing on which to arrest or detain Ward and no facts on which to suspect any law violation. Agent Woodlieg also testified that they did not know or suspect that appellant had the false Selective Service card. The agents justified the stop of appellant's vehicle on the ground that they were carrying out their "traditional investigatory function," explaining that they wanted to interview appellant in secret.

With all due deference to the federal agents' duties to make criminal investigations, I am unable to justify the manner they chose for approaching the appellant. First, there were no exigent circumstances to justify the stop as when the police have a founded suspicion that fresh criminal activity is afoot. Here there was no emergency situation. There was no need for immediate action. The agents were not fearful appellant would leave town. The stop was not directed at a particular crime, but was part of a general investigation that had been started months before. The agents had never sought an interview with appellant at his house or place of business although that could have been arranged. Instead they chose to contact appellant for an interview by tailing his car and pulling him over to a stop by a siren on the public street.

Second, the stop was not made by local law enforcement officers as guardians of the peace, but by federal agents with the duty to enforce specific federal statutes only. *See* Frye v. United States, 315 F.2d 491, 494 (9th Cir.), cert. denied, 375 U.S. 849, 84 S.Ct. 104, 11 L. Ed.2d 76 (1963).

Third, and most important of all, the stop was not made because of something appellant had done, or was suspected of having done. Rather, the stop was made for the purpose of questioning appellant about a third person.[2] Investigative stops based on a person's suspicious activities are constitutionally permissible. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Vehicular stops based on the driver's furtive actions may be unlawful, however, if the police officers did not have reasonable grounds for making the stop. United States v. Majourau, 474 F.2d 766 (9th Cir., 1973); United States v. Davis, 459 F.2d 458 (9th Cir. 1972); United States v. Nicholas, 448 F.2d 622 (8th Cir. 1971). The stop of appellant was not a *Terry* "investigative stop," since appellant had done nothing to direct the agents' suspicion at him.[3]

Considering these differences, I conclude the stop of appellant must be distinguished from the general "investigative stop" approved in *Terry* and in decisions by this court. Wilson v. Porter, 361 F.2d 412, 415 (9th Cir. 1966). The stop in this case unreasonably interfered with appellant's right as a motorist to

---

2. "No, I had no intentions of arresting Mr. Ward. The sole purpose of my stopping him was for an interview, and that was all . . . . In relation to fugitive matters . . . concerning William Charles Ayres." (Testimony of Agent Woodlieg, R.T. at 10).

3. " . . . [T]he agents had no charge on which to suspect any law violation prior to seeing the Selective Service card; . . . " Government Brief at 13.

"Here, the agents had no knowledge of a crime having been committed and they did not observe anything which would lead them to suspect a crime had been committed by Ward, prior to seeing the Selective Service card." Government Brief at 14–15.

"The stop in this case was not a *Terry* "investigative stop" since the agents did not suspect that a crime had been or was being committed by appellant, Ward." Government Brief at 21.

travel without interference. The Supreme Court has noted in Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949):

> "The citizen who has given no good cause for believing he is engaged in . . . . [unlawful] activity is entitled to proceed on his way without interference." 338 U.S. at 177, 69 S.Ct. at 1311. *See also* Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

This right to proceed without interference was violated in Clay v. United States, 239 F.2d 196 (5th Cir. 1956), when a known gambler was forced off the road by federal Revenue Agents. As in this case, the agents stopped the vehicle to question the driver although there was no reason to believe that a crime was being committed. The agents knew where appellant lived and where he worked and they had kept him under surveillance for a number of days prior to the time they forced his automobile off the public highway. The court concluded that evidence seized as a result of the unlawful stop should have been suppressed.

The mere desire of F.B.I. agents to talk to an individual about another individual is insufficient reason for forcibly stopping a citizen's vehicle on the highway when measured against the embarrassment and indignity incident to a stop on a city street by means of a siren by four agents. It is idle for the appellee to argue that because appellant was not under formal arrest he "voluntarily" produced the incriminating document. He was being forcibly detained under the heavy hand of the law and he knew it and they knew it. Under the circumstances of this case, I am compelled to believe the stop was an unreasonable intrusion under the Fourth Amendment. The materials discovered as a result of the stop should have been suppressed because they were the fruit of the unlawful stop. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). In my judgment, appellant's conviction should be reversed.

Before CHAMBERS, MERRILL, KOELSCH, BROWNING, DUNIWAY, ELY, HUFSTEDLER, WRIGHT, TRASK, CHOY, GOODWIN, and WALLACE, Circuit Judges.

### ON HEARING EN BANC

TRASK, Circuit Judge:

Robert Portsche Ward appeals from his conviction of knowing possession of a false Selective Service registration card, 50 U.S.C. App. § 462(b)(5). The conviction was based upon evidence obtained from the appellant by FBI agents after a vehicular stop and request for identification. The appellant's pretrial motion to suppress the evidence was denied by the district court. We reverse on the ground that the stop of Ward's automobile violated the appellant's Fourth Amendment right against unreasonable search and seizure and that the violation required the suppression of evidence obtained as a result of the unlawful stop.

The evidence presented at the suppression hearing indicated that the FBI wished to interview the appellant regarding a federal fugitive, William Ayres, who had been indicted in 1970 by a federal Grand Jury. Prior to April 4, 1972, the date of the road stop, FBI agents surveilled Ward on different occasions, waiting for an opportunity to interview Ward outside the presence of friends and acquaintances.

The evidence further established that:

(1) The FBI agents knew where the appellant lived and had known for a number of months prior to April 4, 1972.

(2) The agents knew the appellant's car by make, model, color, year and license number.

(3) The agents presumably knew that the appellant had worked as a typist for a practicing lawyer, but no effort was made to contact the appellant at that office or through the attorney.

(4) The agents knew that the appellant was using the name of Gerald Clay-

ton Washburn and had known for a number of months. Appellee acknowledges that it is not a crime in itself to assume a false identity.

(5) The agents knew that the appellant had a Washington driver's license in the name of Gerald Clayton Washburn and had seen a copy of the driver's license in the state's records prior to April 4, 1972. (Washington drivers' licenses have the driver's photograph on them).

(6) The agents were also aware that there were birth records in Seattle of a Gerald Clayton Washburn who had died as a small child several years prior to April 4, 1972.

On April 4, 1972, agents Woodlieg and Clark together with two agents new to Seattle, spotted the appellant leaving his residence in his Volkswagen. They followed the appellant to and from a food co-op and then caught up with him at a stop sign at a nearby intersection. The agents then turned on the siren in their unmarked car and motioned the appellant to go around the corner and stop. The appellant immediately complied, turning the corner and pulling over to the side of the road. The agents stopped in the street behind appellant's Volkswagen but about five feet from the curb. All four agents exited the car and approached the appellant. Agent Woodlieg testified that he and other agents identified themselves, informed the appellant that they wanted to interview him about federal fugitives and asked appellant to identify himself, already knowing that appellant was using the name Washburn and had a driver's license in that name. When the appellant produced the driver's license, Agent Woodlieg informed him that Washburn did not exist and that he could not be Washburn. Appellant in response to this shrugged his shoulders and handed Woodlieg a stack of identification papers as if to say, "What do you mean, of course I'm Washburn, see." Agent Woodlieg saw that the top identification card was a Selective Service registration certificate in the name of Washburn, and immediately informed the appellant

that he was under arrest and advised him of his rights.

Agent Woodlieg further testified that the FBI did not know or suspect that the appellant had the false Selective Service card; that prior to seeing the Selective Service card he had no grounds on which to arrest or detain Ward and no facts on which to suspect any law violation. The agents justified the stop of appellant's vehicle on the ground that they were carrying out their "traditional investigatory function," explaining that they wanted to interview the appellant in secret.

Central to the determination of this appeal is the legality of the FBI's initial interception of the appellant's automobile. If the stop was illegal, then the evidence obtained as a result of the stop should have been suppressed.

■ Although not all street encounters between citizens and law enforcement agents involve Fourth Amendment considerations, when an officer accosts an individual and by physical force or show of authority restrains his liberty short of arrest, the stop becomes a "seizure" of the person. Terry v. Ohio, 392 U.S. 1, 16, 19, n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Such a seizure must then be tested for reasonableness under the Fourth Amendment. This requires the courts to weigh the need for police action against the inconvenience and intrusion which the stop entails. Terry v. Ohio, *supra*; United States v. Mallides, 473 F.2d 859 (9th Cir. 1973); United States v. Leal, 460 F.2d 385 (9th Cir.), cert. denied, 409 U.S. 889, 93 S.Ct. 154, 34 L.Ed.2d 146 (1972).

The appellee would forestall considerations of the reasonableness of the stop, arguing that the FBI's interception of appellant's car was merely an effective method of initiating a private interview, and the use of a siren equivalent to a knock on the door. Additional Brief for Appellee at 3–4. The appellee thus claims that the road stop did not amount to a "seizure" within the purview of the Fourth Amendment.

■ Although the Supreme Court has not defined the precise point at which a police encounter becomes subject to Fourth Amendment scrutiny, Terry v. Ohio, *supra*, 392 U.S. at 19, n. 16, 88 S.Ct. 1868, it is clear that when four federal agents pull a motorist off the road by use of a siren there has been a seizure even though the agents only intended to make a routine investigation. United States v. Nicholas, 448 F.2d 622 (8th Cir. 1971); Carpenter v. Sigler, 419 F.2d 169 (8th Cir. 1970); *see* United States v. Mallides, *supra*. The appellant as a law abiding motorist was forced to respond to the siren (unlike the knock at the door); and despite the fact that the appellant was not formally under arrest, when the four agents flashed their badges and surrounded him, his freedom to depart was realistically restrained. United States v. Nicholas, *supra*. We find therefore that the FBI's interception of Ward's automobile under these circumstances did constitute a "seizure" which must be examined for reasonableness under the Fourth Amendment.

The circumstances surrounding the stop in the present case are distinguishable from those involved in Terry v. Ohio, *supra*, and the decisions of this court which have upheld certain "investigative stops." *E. g.*, United States v. Bugarin-Casas, 484 F.2d 853 (9th Cir., 1973); Wilson v. Porter, 361 F.2d 412 (9th Cir. 1966). In conformity with *Terry*, we have repeatedly held that a founded suspicion that criminal activity is afoot is a minimum requirement for any lawful detentive stop. United States v. Leal, *supra*; United States v. Davis, 459 F.2d 458 (9th Cir. 1972). The facts in the present case, however, preclude such a finding:

First, there was no crime "afoot." The FBI agents did not stop appellant's car in connection with any particular crime, but rather the stop was pursuant to a general criminal investigation that had begun several months before. There was no emergency situation nor any need for immediate action. The FBI was not fearful that the appellant would leave town. The agents never sought an interview with the appellant at either his home or place of business although both could have been arranged. In short, there were no exigent circumstances warranting the extreme nature of a vehicular stop by a siren on a public street.

■ Secondly, while local law enforcement officers may make vehicular stops as guardians of the peace generally, federal agents may enforce only specific federal statutes. Frye v. United States, 315 F.2d 491, 494 (9th Cir.), cert. denied, 375 U.S. 849, 84 S.Ct. 104, 11 L.Ed.2d 76 (1963). Here, by the government's own admission, the FBI agents had no reason to suspect that the appellant had violated or was going to violate any federal law. Brief for Appellee at 13–15.

■ Finally, and most significantly, the stop was not made pursuant to the agent's founded suspicion that the *detainee* was involved or about to be involved in criminal activity.[1] Rather, the stop was made for the purpose of questioning the appellant about a *third person*. This then was not a ". . . brief stop of a *suspicious individual* [made] in order to determine his identity or to maintain the status quo momentarily . . . ." Adams v. Williams, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (emphasis added), for the appellant was not the object of the FBI's suspicions. Clearly, the narrow exception of Terry v. Ohio, *supra*, which allows investigative stops on grounds short of probable cause cannot

---

1. " . . . [T]he agent had no charge on which to suspect any law violation prior to seeing the Selective Service card; . . . " Brief for Appellee at 13.

"Here, the agents had no knowledge of a crime having been committed and they did not observe anything which would lead them to suspect a crime had been committed by Ward, prior to seeing the Selective Service card." *Id.* at 14–15.

"The stop in this case was not a *Terry* 'investigative stop' since the agents did not suspect that a crime had been or was being committed by appellant, Ward." *Id.* at 21.

**170**

be stretched so far as to allow detentive stops for generalized criminal inquiries.

For these reasons the FBI's interception of the appellant's car must be distinguished from the permissible investigative stops we have approved in other situations. *E. g.,* United States v. Bugarin-Casas, *supra.* The stop in this case unreasonably interfered with the appellant's right as a motorist to travel without interference. Brinegar v. United States, 338 U.S. 160, 177, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L. Ed. 543 (1925). The Supreme Court in Almeida-Sanchez v. United States, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973) most recently reaffirmed the important nature of this right. The court approvingly quoted Justice Taft that ". . . those lawfully within the country, entitled to use the public highways, have a right to free passage without interruption or search . . ." in absence of good cause. *Id.* at 274, 93 S.Ct. at 2540.

Having found the FBI's stop of appellant's car to be an unreasonable intrusion under the Fourth Amendment, we hold that the materials discovered as a result of the stop should have been suppressed as the fruit of the unlawful stop. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *accord,* United States v. Davis, 459 F.2d 458 (9th Cir. 1972); Clay v. United States, 239 F.2d 196 (5th Cir. 1956). "If officers have the right to interfere with that essential pursuit of a nation of automobilists, it must be based on what is known or reasonably believed before the commandeering starts. To allow justification to rest on discovery after intrusion would permit 'the Government * * * to justify the arrest by the search and at the same time to justify the search by the arrest,' Johnson v. United States, 333 U.S. 10, 16, 68 S.Ct. 361, 370, 92 L.Ed. 436, 442." Clay v. United States, *supra* at 200–201.

SNEED, Circuit Judge, who qualified as a judge of this court on September 11, 1973, did not participate in the consideration or decision of this case.

CHAMBERS, Circuit Judge (dissenting):

I dissent for the reasons expressed by Judge Schnacke in our original panel opinion, United States v. Ward, 488 F.2d 162.

Further, it seems more clear than ever to me that this was not a proper case to take en banc.