NUMBER 13-07-044-CR



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


JONATHAN WAYNE GIPSON, Appellant,


v.



THE STATE OF TEXAS, Appellee.

 


On appeal from the 1-A District Court of Jasper County, Texas.


 


O P I N I O N



Before Chief Justice Valdez and Justices Yañez and Benavides


Opinion by Justice Yañez
 Appellant, Jonathan Wayne Gipson, was found guilty of committing the offense of
aggravated robbery (1) and was sentenced to seven and a half years' imprisonment. In two
issues, Gipson asserts the trial court erred in denying his motion to suppress. We affirm.

I. Background

 On September 14, 2005, Jasper Police Department Officers Garret Foster and
Gerald Hudson were dispatched to a Wal-Mart where a robbery had taken place. The
officers received the dispatch at 3:28 a.m. The dispatcher informed the officers that (1) the
suspect was a tall, slender, white male with tattoos; (2) the name of the victim was Mr.
Alcorn; and (3) the suspect was last seen running through a wooded area, southwest of
the Wal-Mart, directly in front of the store. Officer Foster reached the Wal-Mart parking lot
within a minute or two of receiving the dispatch; he entered the parking lot near the wooded
area the suspect was last seen running into. Upon entering the parking lot with his patrol
vehicle's lights and siren on, Officer Foster observed a blue Toyota preparing to exit the
Wal-Mart. As the Toyota was at rest in front of a stop sign within the parking lot, Officer
Foster positioned his vehicle in front of the Toyota, obstructing its forward path. According
to Officer Foster, the Toyota was the only vehicle he saw preparing to exit the parking lot,
and he decided to stop the Toyota because its occupants "were potential suspects or
witnesses to a crime."

 
Officer Foster could see a few white males and one white female in the Toyota. As
Officer Foster exited his vehicle and began walking towards the Toyota, the Toyota's driver
immediately informed him "that some guy was robbed and that he had helped chase the
suspect." Upon learning this, Officer Foster detained the Toyota's occupants for further
questioning. Gipson was one of the Toyota's occupants. According to Officer Foster,
Gipson was the only tall, slender, white male in the Toyota; Gipson also had tattoos on his
arms, appeared nervous, and avoided eye contact with him. The Toyota's passengers,
including Gipson, denied having any knowledge of a robbery. Some of the passengers,
however, later stated that they were witnesses to the robbery.

 While Officer Foster was questioning the Toyota's occupants, Officer Hudson
arrived on the scene. Officer Hudson observed Gipson's demeanor as he sat inside the
Toyota. According to Officer Hudson, Gipson made a lot of movements in the Toyota, and
he appeared "very nervous" and "fidgety." Officer Hudson instructed the Toyota's
occupants to exit the vehicle; he then performed a pat-down on all of them. Before
performing a pat-down on Gipson, Officer Hudson observed "a big bulk" in Gipson's back
pocket. According to Officer Hudson, the objects he felt in Gipson's pocket were the size
of credit cards. Officer Hudson removed the objects from Gipson's pocket to ascertain
whether Gipson was carrying a weapon; Officer Hudson testified that he has seen knives
the size of credit cards. The objects removed from Gipson's pocket turned out to be credit
cards belonging to the victim, Mr. Alcorn. At that point, Gipson was placed under arrest. II. Standard of Review

 Whether a specific search or seizure was reasonable is a mixed question of law and
fact, and our review is conducted de novo. (2) We review a trial court's ruling on a motion to
suppress evidence under a bifurcated standard of review. (3) We do not engage in our own
factual review, rather the trial judge is the sole trier of fact and judge of credibility of the
witnesses and the weight to be given to their testimony. (4) Trial courts are given almost
complete deference in determining historical facts. (5) We review the record to determine
whether the trial court's ruling is supported by the record and correct under some theory
of law applicable to the case. (6)

III. Legality of the Initial Stop

 In his first issue, Gipson contends that the trial court erred because Officer Foster
did not possess the requisite reasonable suspicion required to initially detain him and the
Toyota's other occupants. At the motion to suppress hearing, Officer Foster stated that he
stopped the Toyota because its occupants "were potential suspects or witnesses to a
crime." We will begin by assessing the propriety of the latter justification.

 In Terry v. Ohio, the United States Supreme Court held that a temporary detention
is justified when the detaining officer has specific, articulable facts which, taken together
with rational inferences from other facts, lead him to conclude the person detained is, has
been, or soon will be engaged in criminal activity. (7) When an officer detains a person to
determine whether the person being detained was a witness to a crime, the detention
becomes distinguishable from those involved in Terry. (8) The distinction lies in the fact that
a detention made for the purpose of questioning a potential witness is not being made
pursuant to an officer's suspicion that the detainee was involved or about to be involved
in criminal activity; rather, the detention is being made for the purpose of questioning the
detainee about a third person. (9)

 In Illinois v. Lidster, an individual "challenged the lawfulness of his arrest and
conviction on the ground that the government had obtained much of the relevant evidence
through use of a checkpoint stop that violated the Fourth Amendment." (10) The checkpoint
was created in response to an incident involving a bicyclist that was struck and killed by an
unknown motorist that drove away without identifying himself. (11) About one week later at
about the same time of night and at about the same place, local police set up the highway
checkpoint to obtain more information about the accident from the motoring public. (12)

 The United States Supreme Court observed that "[t]he stop's primary law
enforcement purpose was not to determine whether a vehicle's occupants were committing
a crime, but to ask vehicle occupants, as members of the public, for their help in providing
information about a crime in all likelihood committed by others." (13) The Court went on to
state that such stops are not "automatically, or even presumptively, constitutional"; rather,
their reasonableness and, hence, constitutionality, must be judged on the basis of the
individual circumstances. (14) In judging the reasonableness of the stop in question, the
Court looked "'to the gravity of the public concerns served by the seizure, the degree to
which the seizure advance[d] the public interest, and the severity of the interference with
individual liberty.'" (15) The Court then held that the stop was reasonable, setting forth the
following reasons: (1) "the stop's objective was to help find the perpetrator of a specific
and known crime, not of unknown crimes of a general sort"; (2) the "relevant public concern
was grave"; (3) the stop "advanced this grave public concern to a significant degree"; (4)
the "police appropriately tailored their checkpoint stops to fit important criminal
investigatory needs"; and (5) the "stops interfered only minimally with liberty of the sort the
Fourth Amendment seeks to protect." (16)

 Applying the reasoning employed in Lidster, we find that Officer Foster lawfully
detained the Toyota's occupants. Officer Foster sought to temporarily detain and question
the occupants for the purpose of investigating a specific and known crime. The crime at
issue, as was known to Officer Foster at the time of the detainment, was robbery, which
is of such grave public concern that the offense constitutes a second-degree felony in this
State. (17) Officer Foster's stop advanced this grave public concern to a significant degree
because the stop was being used to obtain information from individuals who were in the
vicinity of the crime at the time it occurred, and were thus possible witnesses to the crime. 
The stop was also more than appropriately tailored to fit investigatory needs. Officer
Foster not only stopped the Toyota in the parking lot where the robbery occurred, but he
stopped it in a specific area of the parking lot where he knew the suspect was last seen
fleeing. Finally, the stop interfered only minimally with the liberty of the Toyota's
occupants. Officer Foster had only blocked the front of the Toyota with his patrol car and
started walking towards it when its driver announced that he had witnessed the robbery. 
The duration of the Toyota's detainment thereafter resulted from the need to question an
actual witness, rather than a potential witness.

IV. Legality of the Pat Down

 In his second issue, Gipson argues that the pat down was unlawful because Officer
Hudson was not warranted in his belief that his safety or the safety of others was in danger. 
When determining whether an officer's weapons search is justified, an appellate court uses
an objective standard to determine whether the facts available to the officer at the time of
the search would warrant a reasonably cautious person to believe that such an action is
appropriate. (18)

 The dispatcher informed Officer Hudson that the suspect was a tall, slender, white
male with tattoos; this description led Officer Hudson to focus on Gipson because he was
a white male with tattoos, and he was the tallest occupant in the Toyota. Officer Hudson
observed Gipson making a lot of movements in the Toyota, and appearing "very nervous"
and "fidgety." Though Gipson denied having any form of identification on his person,
Officer Hudson could visually tell that Gipson had something in his pockets. According to
Officer Hudson, prior to Gipson's pat-down, he observed some "abnormalities in [Gipson's]
pocket, and also within his waistband." Lastly, some of the other occupants in the Toyota
with Gipson had already recanted their initial claim that they had not witnessed a robbery,
forming a cloud of suspicion over all of the Toyota's occupants. In light of all these facts,
we find that Officer Hudson could justifiably believe that his safety or that of others was in
danger.

 When Officer Hudson performed the pat-down on Gipson, he felt objects in Gipson's
pockets that were the size of credit cards. Officer Hudson removed these objects so he
could verify that none of the objects was a knife. We do not believe it was unreasonable
for Officer Hudson to entertain such a possibility. (19) V. Conclusion

 We conclude that Officer Foster's initial action of blocking the Toyota with his
vehicle was a lawful stop of potential witnesses as described in Lidster. We further
conclude that Officer Hudson's search of Gipson's person was the product of Officer
Hudson's reasonable concern for his safety or the safety of others. Accordingly, we
overrule Gipson's two issues on appeal and affirm the trial court's judgment.


 

 LINDA REYNA YAÑEZ,

 Justice




Publish. Tex. R. App. P. 47.2(b).


Opinion delivered and filed this 

the 28th day of August, 2008.


1. See Tex. Penal Code Ann. § 29.03 (Vernon 2003).
2. Kothe v. State, 152 S.W.3d 54, 62-63 (Tex. Crim. App. 2004).
3. Ford v. State, 158 S.W.3d 488, 493 (Tex. Crim. App. 2005).
4. State v. Ross, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000); Guzman v. State, 955 S.W.2d 85, 89
(Tex. Crim. App. 1997).
5. Carmouche v. State, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000).
6. Armendariz v. State, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003).
7. Terry v. Ohio, 392 U.S. 1, 21-22 (1968).
8. See United States v. Ward, 488 F.2d 162, 168-69 (4th Cir. 1973).
9. See id. at 169.
10. Illinois v. Lidster, 540 U.S. at 419, 422 (2004).
11. Id.
12. Id.
13. Id. at 423 (emphasis in original).
14. Id. at 426.
15. Id. at 426-27 (quoting Brown v. Texas, 443 U.S. 47, 51 (1979)).
16. Id. at 427-28.
17. See Tex. Penal Code Ann. § 29.02 (Vernon 2003). We reference the offense of robbery, rather
than aggravated robbery (for which Gipson was convicted), because Officer Foster testified that he did not
know that the robbery was aggravated at the time he detained the Toyota's occupants.
18. Terry, 392 U.S. at 21-22; Griffin v. State, 215 S.W.3d 403, 409 (Tex. Crim. App. 2006).
19. See Johnston v. State, 643 S.W.2d 427, 430 (Tex. App.-Houston [14th Dist.] 1982, writ ref'd) ("The
officer testified he had previously observed wallets to be so constructed as to hold a pistol or knife, and we
hold that based upon this record, it was not unreasonable for the officer to remove it, open it to see if it was
so constructed, and then hand it to appellant.").