IKUTA, Circuit Judge,
dissenting:
The facts of this case are undeniably tragic. But despite the ill-fated sequence of events, the Sheriffs deputies who secured the crime scene did not “violate clearly established statutory or constitutional rights of which a reasonable person would have known,” Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), by delaying the ambulance’s departure for a few minutes, if at all, or detaining the Maxwells while they obtained and executed a search warrant for the Maxwells’ home. Accordingly, qualified immunity protects all the deputies from suit for civil damages. See id.
In reaching the opposite conclusion, the majority draws strained analogies to cases whose facts are not “even roughly comparable to those present in this case,” Rybum v. Huff,-U.S. -, 132 S.Ct. 987, 990, 181 L.Ed.2d 966 (2012), and fails to heed the Supreme Court’s instruction “not to define clearly established law at a high level of generality,” Ashcroft v. al-Kidd, - U.S. -, 131 S.Ct. 2074, 2084, 179 L.Ed.2d 1149 (2011). I therefore join Part IV of the majority opinion but dissent with respect to Part III.
I
In holding that the Sheriffs deputies were not entitled to qualified immunity for allegedly violating Kristin’s due process right to bodily security, the majority misconstrues both the chronology of events and the applicable case law.
A
Kristin was shot inside her house shortly before 10:50 PM on December 14, 2006. At that time, Kristin was able to call 911, to move about the house, to sit upright, and to communicate effectively. At 10:53 PM, Deputy Sheriff Jackson first arrived on the scene. At 10:58 PM, a nurse who lived nearby arrived and found that Kristin was alert, oriented, and able to answer questions appropriately.
*1091 At around 11:00 PM, the first ambulance and paramedics arrived. At 11:03, the paramedics determined that Kristin’s vital signs were within normal limits. Rather than transport Kristin to the hospital immediately, the paramedics decided to call an air ambulance, which would arrive in twenty-five minutes at a landing site ten minutes from the Maxwells’ residence.
At 11:08, the second ambulance arrived. At 11:11 PM, paramedics again determined that Kristin’s vital signs were within normal limits.
At 11:16, Sergeant Michael Knobbe arrived and began the process of securing the crime scene. As part of that process, two Sheriffs deputies took Jim and Kay Maxwell, Kay’s father Fred Stevens, and Kristin’s two children out of the house, and left Kay, Fred and the children in the family motor home in the Maxwells’ driveway. Jim was told to remain in the driveway outside the motor home. According to Jim Maxwell, while he was on his way to the family’s motor home he heard a deputy declare, “Nobody is leaving. This is a crime scene.” This statement, and a statement subsequently made by Jackson during a deposition that Knobbe was “so concerned with the crime scene [he] didn’t want to let the ambulance leave,” is the only evidence the Maxwells offer to support their claim that the deputies caused a delay.
It was not until the paramedics first placed Kristin on a gurney in the back of the Viejas Fire ambulance between 11:18 PM and 11:25 PM that she began exhibiting signs of distress, expelling blood from her mouth. Knobbe testified that he saw paramedics take Kristin back out of the ambulance and place her in a sitting position at some time between 11:23 PM and 11:26 PM.
The ambulance departed at around 11:30 PM and arrived at the landing site at 11:41, approximately eleven minutes after the air ambulance had arrived. Kristin was pronounced dead at 11:42 PM.
Construing these facts in the light most favorable to the Maxwells, as we must on summary judgment, see, e.g., Nelson v. City of Davis, 571 F.3d 924, 928 (9th Cir.2009), two things are clear. First, there is no evidence that the Sheriffs deputies were aware of the urgency of Kristin’s situation when they allegedly delayed the ambulance. After Kristin was shot, she was conscious, communicating effectively, and her vital signs were normal. The County Medical Examiner testified that Kristin’s injury was “survivable and reparable.” The deputies knew that the paramedics who were tending to her decided to wait the 25 minutes it would take for an air ambulance to arrive. Based on multiple contemporaneous assessments of Kristin’s condition in the aftermath of the shooting, the Sheriffs deputies could reasonably conclude that her condition was stable and that a delay of a few minutes would not put her in peril.
Second, any delay caused by the deputies could not have lasted longer than seven minutes. The Maxwells’ evidence shows that the ambulance was not even ready to depart until 11:23 PM at the earliest, when Kristin was placed inside the ambulance a second time. The ambulance left at 11:30 PM, at most seven minutes later.
B
Under these facts, the deputies are entitled to qualified immunity. “Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.” Reichle v. Howards, — U.S. -, 132 S.Ct. 2088, 2093, *1092 182 L.Ed.2d 985 (2012). A government official’s conduct does not violate clearly established law unless, at the time of the challenged conduct, the contours of a right were “sufficiently clear ‘that every reasonable official would have understood that what he is doing violates that right.’ ” Id. (emphasis added) (alterations omitted) (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).
The right at issue here was Kristin’s due process right to bodily security. The majority claims that the deputies should have understood they were violating this right because they delayed the ambulance from leaving, thus putting her in danger. Maj. op. at 13. But under our case law, government officials cannot be held liable for affirmatively placing the plaintiff in a position of danger unless they acted with “deliberate indifference to [a] known or obvious danger.” Kennedy v. City of Ridgefield, 439 F.3d 1055, 1062 (9th Cir.2006) (quoting L.W. v. Grubbs, 92 F.3d 894, 900 (9th Cir.1996)). This means that the plaintiffs must present evidence that the government officials “recognize[d] the unreasonable risk and actually intend[ed] to expose the [victim] to such risks without regard to the consequences to the [victim].” Grubbs, 92 F.3d at 899 (quoting Uhlrig v. Harder, 64 F.3d 567, 573 n. 8 (10th Cir.1995)).
There is no such evidence here. And there is no basis for the majority’s conclusion otherwise. The only case from this circuit holding state deputies liable for preventing a person from receiving emergency medical care is not remotely close to this case. See Penilla v. City of Huntington Park, 115 F.3d 707, 710 (9th Cir.1997). In Penilla, the Ninth Circuit held police officers liable for a due process violation where, after finding a man “in grave need of medical care,” they inexplicably can-celled a 911 call to paramedics, dragged the man from his porch into his empty house, locked the door, and left him there alone, where he died. Penilla, 115 F.3d at 708. The court found that the officers “took affirmative actions that significantly increased the risk facing Penilla” by “ma[king] it impossible for anyone to provide emergency medical care to [him].” Id.
In Penilla, it should have been clear to any reasonable officer that the victim would die without immediate medical assistance. But there was no such evidence in this case. On the contrary, Kristin’s vital signs were within normal limits and her condition appeared to be stable until shortly before her death. Instead of putting the victim beyond the reach of any help, as in Penilla, the deputies at most delayed the ambulance’s departure for a few minutes once paramedics had already begun administering medical care. Finally, even if the (at most) seven-minute delay before the ambulance left the property could have placed Kristin in danger, there is no evidence that the deputies actually recognized that risk.
This case is far more similar to Estate of Amos ex rel. Amos v. City of Page, Arizona, 257 F.3d 1086 (9th Cir.2001), where we held that deputies were not liable even though they interfered with third party rescue efforts. Id. at 1089. In Estate of Amos, the police prevented civilian efforts to search for the victim of a car accident, who had wandered off into the desert. The police called off their own search efforts later that night when their flashlights lost power. Id. Months later, the victim was discovered dead at the bottom of a canyon. Id. We rejected the plaintiffs argument that the officers were liable because “they greatly increased [the victim’s] risk of danger when they called off civilian search efforts at the accident site and did *1093 not provide adequate replacement protection.” Id. at 1091. Although the plaintiffs described “a bungled and ineffectual police search,” we held that the facts did not demonstrate that the police officers “were aware of a known and significant risk of death ‘yet consciously chose a course of action that ignored the risk.’ ” Id. at 1092 (quoting Ross v. United States, 910 F.2d 1422, 1433 (7th Cir.1990)). As in Estate of Amos, the Maxwells have described the deputies’ emergency response as “bungled and ineffectual,” but they have not established deliberate indifference. Id.
Instead of citing relevant case law, the majority makes the unsupported and con-clusory statement that “it was obvious” that the deputies violated Kristin’s due process right to bodily security. Maj. op. at 1083-84. But only in retrospect is it “obvious” that the brief delay may have raised the risk that Kristin would die from her injuries. This very term, the Supreme Court reprimanded the Ninth Circuit for judging the reasonableness of officers’ conduct “with the 20/20 vision of hindsight” rather than “from the perspective of a reasonable officer on the scene.” Rybum, 132 S.Ct. at 992 (quoting Graham v. Connor, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). The Court reaffirmed that “[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving.” Id. (quoting Graham, 490 U.S. at 396-97, 109 S.Ct. 1865). Contrary to the Court’s direction, the majority’s eyes here are focused on the rearview mirror. Given that Kristin’s medical condition initially appeared stable and that paramedics were actively tending to her at the time of the alleged delay, the danger was not so obvious that a decision to briefly delay the ambulance shows deliberate indifference.
II
The majority likewise errs in holding that the Sheriffs deputies were not entitled to qualified immunity with respect to the Maxwells’ claim that they were unreasonably seized in violation of the Fourth Amendment, and that one of the deputies, Sergeant Kneeshaw, used excessive force against Jim Maxwell when he attempted to see his wife. As before, the majority’s conclusion is based on a misconstruction of both the facts and the law.
A
After Knobbe began the process of securing the crime scene, Kay and Fred Maxwell and the two children were told to remain in the family’s motor home. The motor home was equipped with a bathroom, running water, electricity, heat, a bed, and a TV. Kay testified that although she could not get the heat to work at first, a deputy was “nice enough to crawl underneath” the motor home to turn the propane on. Kay put the children in bed and turned on the TV. Kay’s father eventually fell asleep in a chair.
Jim Maxwell remained outside the motor home; the deputies wanted to restrict Jim and Kay (the two witnesses of the crime) from communicating with each other before they were interviewed so that the deputies could “obtain untainted information related to the homicide.” The deputies also told Jim and Kay that they could not follow their daughter in the ambulance.
According to the undisputed facts, at some time after 1:00 AM, Kneeshaw told Jim Maxwell that Kristin had died. Although Jim wanted to tell his wife, Kneeshaw told him he had to stay in the driveway. Jim stated, “You will have to shoot me, I am going to see my wife,” and continued walking to the motor home. *1094 Kneeshaw stepped in front of Jim and again told him to stop, but Jim attempted to continue walking. At that point, Kneeshaw sprayed Jim with pepper spray and struck him on the leg with his baton. Kneeshaw and Knobbe then handcuffed Jim’s hands behind his back. They removed the handcuffs shortly thereafter. Jim testified that a deputy then asked him whether he was okay and allowed him to rinse his eyes out at the faucet at the end of the street. Jim also testified that the pepper spray did not cause him any pain or discomfort, and that it was not the pepper spray or baton that made him stop, but only the two deputies who handcuffed him. He apologized to the deputies after the altercation.
Around two hours later, at 3:35 AM, a homicide detective obtained a search warrant for the Maxwells’ home; the search began at roughly 3:50 AM. Meanwhile, two detectives began interviewing Jim Maxwell regarding the murder investigation at 3:26 AM. The detectives interviewed Kay Maxwell beginning at 4:50 AM, and they finished questioning her at 5:55 AM. The search of the house was ongoing during these interviews.
The Maxwells claim they were unlawfully detained, in violation of their Fourth Amendment rights, for over six hours, from 11:16 PM until the detectives finished interviewing Kay at 5:55 AM. The detectives testified (and the Maxwells did not dispute) that they did not order Jim Maxwell or Kay Maxwell to submit to being interviewed against their will. Neither Jim nor Kay asked to leave during their interviews, and both were cooperative. Sergeant Edward Musgrove testified that Jim and Kay Maxwell were interviewed “at the same time the residence was being searched” in order to “reduce[ ] the time that the witnesses were excluded from the residence, and restricted from communicating with each other.”
B
No Supreme Court or Ninth Circuit decision establishes that the deputies’ conduct in detaining, separating, and questioning the Maxwells while they obtained and executed a search warrant for the Maxwells’ home was unreasonable. Rather, all the precedents point in the other direction.
First, it is well established that a search warrant “carries with it the limited authority to detain the occupants of the premises while a proper search is conducted.” Michigan v. Summers, 452 U.S. 692, 705, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981); see also Muehler v. Mena, 544 U.S. 93, 98, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005). Indeed, “[a]n officer’s authority to detain incident to a search is categorical; it does not depend on the ‘quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.’ ” Mena, 544 U.S. at 98, 125 S.Ct. 1465 (emphasis added) (quoting Summers, 452 U.S. at 705 n. 19, 101 S.Ct. 2587). It is irrelevant whether the detained individual is suspected of criminal activity because “ ‘[t]he connection of an occupant to [a] home’ alone ‘justifies a detention of that occupant.’ ” Id. at 99 n. 2, 125 S.Ct. 1465 (quoting Summers, 452 U.S. at 703-04, 101 S.Ct. 2587). Therefore, the deputies’ authority to detain the Maxwells during the roughly two and a half hours after the search warrant issued did not violate their Fourth Amendment rights.
In fact, aggressive and prolonged detentions of the residents of a house can be justified in connection with executing a search warrant, even when the search does not occur in the immediate aftermath of a violent crime. Thus, in Mena, the Court held that it was “plainly permissible” for *1095 officers executing a search warrant, which was based on probable cause to believe that a gang member lived in the target house, to enter the bedroom of a woman not suspected of gang activity while she was asleep in bed, place her in handcuffs at gunpoint, and detain her (along with three other individuals) in the garage for two to three hours while the search proceeded. Id. at 95-96, 98, 125 S.Ct. 1465. Putting a non-suspect in handcuffs for two to three hours was not an unreasonable seizure because “[i]nherent in Summers’ authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention.” Id. at 98-99, 125 S.Ct. 1465. Similarly, in Dawson v. City of Seattle, 485 F.3d 1054 (9th Cir.2006), we held that officers could reasonably detain boardinghouse residents for two hours while executing inspection warrants for evidence of rodent infestation, even though the officers drew their weapons and screamed at the residents, forced one resident outside without her shoes; refused to allow the detainees to drink coffee, smoke cigarettes, or go to the bathroom without an escort; and questioned the detainees about whether they had drugs or weapons in their rooms. Id. at 1058-60. We emphasized that, if not detained, the residents “might have fled, rendering themselves unavailable to answer questions pertinent to the search,” or mistakenly “impaired the search rather than assisted it.” Id. at 1066-67. The officers’ interrogation of the detainees did not alter the Fourth Amendment analysis because there was no evidence that the questioning prolonged the detention or that “the police conditioned Plaintiffs’ release from detention on Plaintiffs’ willingness to submit to an interrogation.” Id. at 1068-69.
Second, both Supreme Court and Ninth Circuit cases support the deputies’ decision to detain the Maxwells while seeking a search warrant based on probable cause to believe that a violent crime had just occurred inside the Maxwells’ house. The Supreme Court has made clear that a search warrant is not always necessary to justify detention of the occupants of a targeted home. Thus, in upholding the detention of an individual while officers executed a search warrant for his home, Summers noted that the holding did not “preclude the possibility that comparable police conduct may be justified by exigent circumstances in the absence of a warrant.” Summers, 452 U.S. at 703 n. 17, 101 S.Ct. 2587. As suggested by Summers, the Court later held that exigent circumstances justified officers in detaining a man outside his home for roughly two hours while they obtained a search warrant for the home. See Illinois v. McArthur, 531 U.S. 326, 328, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001). McArthur explained that four factors made the warrantless detention reasonable: (1) the officers “had probable cause to believe that ... [the] home contained evidence of a crime and contraband,” (2) the officers “had good reason to fear that, unless restrained, [the defendant] would destroy evidence before they could return with a warrant,” (3) the officers “made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy” by not searching the home or arresting the resident before obtaining the warrant, and (4) the detention was “no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant.” Id. at 331-33, 121 S.Ct. 946.
These cases fully support the conclusion that the exigencies present in this case made it reasonable for the deputies to detain the Maxwells while seeking a search warrant. The deputies arrived minutes after a violent crime had occurred, and it was their responsibility to assist the victim *1096 and secure the crime scene. They realized that the Maxwells’ home contained evidence necessary to prosecute the perpetrator. See McArthur, 531 U.S. at 332, 121 S.Ct. 946. They also had good reason to believe that allowing the Maxwells back in the house could compromise the evidence. See Dawson, 435 F.3d at 1067; see also McArthur, 531 U.S. at 326, 332, 121 S.Ct. 946. For example, Jim Maxwell admitted that in the immediate aftermath of the shooting, he picked up the gun Bruce used to shoot Kristin in a misguided attempt to assist the deputies by bringing the weapon to them. Finally, they needed to get the statements of witnesses, and they reasonably believed that if they did not separate Jim and Kay, the two of them might influence one another’s recollections, making their statements vulnerable to challenge in court and jeopardizing the prosecution.
Moreover, the deputies detained the Maxwells in a reasonable manner. In fact, the Maxwells were treated far more humanely than were the detainees in Mena or Dawson, who also were not suspected of any crime. The deputies allowed Kay, her father, and the children to wait in the privacy of their family motor home for the duration of the pre-warrant period. Deputy Kneeshaw’s brief use of force against Jim, which Jim himself testified did not cause him any memorable pain or discomfort, was fully justified in order “to effectuate the detention.” Mena, 544 U.S. at 99, 125 S.Ct. 1465. And the four-hour period was no longer than reasonably necessary for the police to obtain the warrant. All the evidence in the record indicates that the deputies acted diligently in obtaining the warrant as quickly as possible at a time “when it is reasonable to assume that judicial officers are not as readily available for consideration of warrant requests.” Segura v. United States, 468 U.S. 796, 812-13, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984) (holding that a 19-hour warrantless seizure of a building, half of which occurred during the period between 10:00 PM and 10:00 AM the following day, was reasonable under the circumstances). Based on these factors, the deputies’ decision, “even if constitutionally deficient, reasonably misapprehend[ed] the law governing the circumstances.” Brosseau v. Haugen, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004).
The majority’s reliance on United States v. Ward, 488 F.2d 162 (9th Cir.1973) (en banc), and Illinois v. Lidster, 540 U.S. 419, 124 S.Ct. 885, 157 L.Ed.2d 843 (2004), is puzzling, because these cases are far afield from the issues before us. Both decisions consider when the Fourth Amendment allows police to stop cars on the road in order to investigate crimes committed by third parties. In Lidster, the Court held that the Fourth Amendment allowed police to stop motorists at a highway checkpoint to ask them whether they had any information about a recent hit-and-run accident. Lidster, 540 U.S. at 426-28, 124 S.Ct. 885. In Ward, we held that FBI agents violated a driver’s right to travel the public roads when they pulled him over to interview him regarding a months-old investigation of a third-party fugitive. Ward, 488 F.2d at 169. Unlike Mena and Dawson, these cases provide no guidance as to when a police officer acts reasonably in securing a crime scene and detaining occupants and witnesses. “Because ‘[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application,’ ” the Court has explained, “its proper application requires careful attention to the facts and circumstances of each particular case.” Graham, 490 U.S. at 396 (internal quotation marks omitted) (quoting Bell v. Wolfish, 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). For instance, “[t]he general proposition ... that an unreasonable search or *1097 seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established.” al-Kidd, 131 S.Ct. at 2084; see also Brosseau, 543 U.S. at 198 (emphasizing that the assessment of clearly established law in the Fourth Amendment context “must be undertaken in light of the specific context of the case, not as a broad general proposition”) (quoting Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), overruled on other grounds by Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)). Because the facts and circumstances of Lidster and Ward shed no light on whether the detention and separation of building occupants in the immediate aftermath of a shooting is reasonable, these cases do not support the majority’s determination that there was clearly established law prohibiting the deputies’ conduct.
Ill
Finally, even if the majority were correct that the deputies violated clearly established law, it is impossible to conclude that Captain Gregory Reynolds and Lieutenant Anthony Salazar could be held liable merely because they were standing behind yellow crime tape at the scene.
We have long held that officers may not be held liable “merely for being present at the scene of an alleged unlawful act” or for being a member of the same team as the wrongdoers. Jones v. Williams, 297 F.3d 930, 936-38 (9th Cir.2002) (emphasis added). More recently, Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), clarified that there is no respondeat superior liability under § 1983. Rather, a government official may be held liable only for the official’s own conduct. Id. at 675-76, 129 S.Ct. 1937. To bring a § 1983 action against a supervisor, the plaintiff must show: (1) the supervisor breached a legal duty to the plaintiff, see Starr v. Baca, 652 F.3d 1202, 1207-08 (9th Cir.2011); (2) the breach of duty was “the proximate cause” of the plaintiffs constitutional injury, id. at 1207, and (3) the supervisor had at least the same level of mens rea in carrying out his superintendent responsibilities as would be required for a direct violation of the plaintiffs constitutional rights, Iqbal, 129 S.Ct. at 1949; see also Starr, 652 F.3d at 1207.
Here the Maxwells do not allege that Reynolds and Salazar took any affirmative acts to set in motion the allegedly unconstitutional acts of their subordinates, nor do they present any evidence that Reynolds and Salazar knew about their subordinates’ conduct in delaying the ambulance or detaining and separating the Maxwells. Moreover, they do not dispute that neither Reynolds nor Salazar crossed the yellow tape across the Maxwells’ driveway that restricted entry to the crime scene. The Maxwells allege merely that Reynolds and Salazar (1) were the highest ranking officials at the scene, (2) could observe the crime scene from the driveway, and (3) heard Kneeshaw yelling at Jim Maxwell to “stop, stop” just before using pepper spray and striking Jim with his baton.
These allegations are insufficient to create a genuine issue of material fact that Reynolds and Salazar breached a legal duty to the Maxwells, that they were the proximate cause of the Maxwells’ constitutional injuries, or that they acted with the requisite state of mind. First, the Max-wells do not allege that the supervisors were even aware that the deputies delayed Kristin’s departure, let alone that the supervisors acted with deliberate indifference. Nor can we infer, solely based on geographic proximity, that Reynolds and Salazar knew or reasonably should have known that the other Sheriffs deputies had forcibly detained the Maxwells and *1098 prevented them from seeing their daughter and each other, and that there were no exigent circumstances to justify the detention. This is especially true given that Reynolds and Salazar never entered the crime scene. Nor is there any evidence “of a specific policy implemented by the Defendants or a specific event or events instigated by the Defendants that led to these purportedly unconstitutional” seizures. Hydrick v. Hunter, 669 F.3d 937, 942 (9th Cir.2012). As in Hydride, “the factual allegations in Plaintiffs’ complaint resemble the ‘bald’ and ‘conclusory’ allegations in Iqbal, instead of the detailed factual allegations in Starr.” Id. at 941. It is therefore clear that Reynolds and Salazar cannot be held liable for the alleged constitutional violations of other deputies on the scene.
IV
It is a truism that “tragic facts make bad law.” Wyeth v. Levine, 555 U.S. 555, 604, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009) (Alito, J., dissenting). Nevertheless, we may not furnish a cause of action where the law does not supply one. See Whitmore v. Arkansas, 495 U.S. 149, 166, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990); see also Gusman v. Marrero, 180 U.S. 81, 87, 21 S.Ct. 293, 45 L.Ed. 436 (1901). The deputies arriving at the Maxwells’ residence faced a chaotic scene: a woman had been shot in the jaw; the perpetrator was still in the house; multiple ambulances and paramedics were responding to the scene; and frantic relatives were milling about. From the perspective of the deputies, it was more than merely reasonable to take steps to secure the crime scene and separate the witnesses — it was their duty. The majority has not pointed to a single case that clearly establishes that the deputies’ actions here violated the Maxwells’ constitutional rights. Under existing case law, the deputies are entitled to qualified immunity for their actions. I therefore respectfully dissent.